Erving Paper Mills Corporation v. Commissioner of Revenue.

ERVING PAPER MILLS CORPORATION & another[1] vs.
COMMISSIONER OF REVENUE.

No. 97-P-1329.

Suffolk. December 7, 1998. - March 23, 2000.

Present: JACOBS, SMITH, & RAPOZA, JJ.

*Taxation,* Corporation, Abatement, Accounting principle. *Administrative Law,*
Substantial evidence.

The Appellate Tax Board correctly concluded that a taxpayer's obligations
under 33 U.S.C. § 1284(b)(1)(B) (1972) (repealed by Pub. L. 96-483,
§ 2[a], 94 Stat. 2360 [1980]) to repay a portion of Federal funds expended
on the construction of wastewater treatment plants were not deductible li-
abilities (under the accrual method of accounting) in tax years 1977, 1978,
and 1979, where the taxpayer never had any obligation to make such pay-
ments in those tax years and where the obligation, in any event, remained
contingent on the Federal government requiring repayment. [17-19]

APPEAL from a decision of the Appellate Tax Board.

*Timothy W. Mungovan (David Kavanaugh* with him) for the
taxpayer.

*Thomas K. Condon* for Commissioner of Revenue.

RAPOZA, J. Erving Paper Mills Corporation and its subsidiary,
Baldwinville Products, Inc. (jointly, the taxpayer), appeal from
the Appellate Tax Board's (board) denial of its applications for
abatement of corporate income taxes for fiscal years 1977
through 1979.[2] We conclude that there is substantial evidence to
support the decision of the board, and we affirm.

1. *Facts.* The taxpayer is a manufacturer of paper products,
with plants located in the towns of Erving and Templeton. As a

---

[1]Baldwinville Products, Inc., a wholly owned subsidiary of Erving Paper
Mills.

[2]The taxpayer requested abatements of $117,920 and $62,642 for 1977 and
1978, respectively, relative to its plant in Erving. An abatement of $34,347
was requested for 1979 relative to the plant in Templeton.

result of the enactment of various Federal environmental protection laws, it became necessary for the taxpayer to devise a plan for the appropriate disposal of wastewater and sewage generated by its two plants. Prompted by concern that the financial burden of building the necessary facilities would prove overwhelming, and in light of the importance of the taxpayer's manufacturing plants to their economic welfare, Erving and Templeton collaborated with the taxpayer in addressing the wastewater treatment issue.

In 1972, Congress enacted the Water Pollution Control Act Amendments of 1972, Pub. L. 92-500, 86 Stat. 816, codified at 33 U.S.C. §§ 1251 et seq. (1972 Act), which provided Federal financing for new public wastewater treatment facilities to ensure compliance with Federal environmental regulations. Under § 201(g)(1) of the Act, 86 Stat. at 833, grants could be awarded only to a "State, municipality, or intermunicipal or interstate agency for the construction of publicly owned treatment works."[3] 33 U.S.C. § 1281(g)(1) (1972).

As the taxpayer, a private corporation, was not eligible for the Federal funding available to municipalities for the construction of wastewater treatment facilities, it entered into an agreement with Erving and Templeton whereby the towns would obtain Federal construction financing and the taxpayer would bear all costs and responsibilities for the operation and maintenance of the treatment plants. The 1972 Act mandated, in § 204(b), 86 Stat. at 836, that industrial users of publicly owned treatment plants, such as the taxpayer, pay a pro rata share of the construction, operation, and maintenance costs of such facilities based on the extent of each industrial user's use of the facility. 33 U.S.C. § 1284(b)(1)(B) (1972) (repealed by Pub. L. 96-483, § 2[a], 94 Stat. 2360 [1980]). Under this industrial cost

---

[3]Under the 1972 Act, Federal funding covered seventy-five percent of the construction cost of the wastewater treatment facilities. Pub. L. 92-500, § 202(a), 86 Stat. at 834. The Commonwealth provided an additional fifteen percent of the construction costs. The taxpayer was responsible for ninety-nine percent and ninety-five percent of the net capital costs, respectively, of the Erving and Templeton plants. The net capital cost was equal to that portion of the capital cost which was not funded either by Federal or State grants. The tax impact of the State funding and the taxpayer's costs as well as expenditures related to the operation and maintenance of the facilities is not an issue in this case. Our discussion is limited to a consideration of the effect of the Federal funding and the taxpayer's repayment obligations on its abatement applications.

recovery (ICR) provision, the industrial user would be obligated to repay to the Federal government, over a thirty-year period, a portion of the funding commensurate with its share in the use of the treatment facility. Here, the taxpayer was the sole industrial user of the two plants and, under the ICR provision, would thus be required to repay ninety-nine percent of the Federal funds allocated to the towns of Erving and Templeton.[4]

On July 3, 1973, Erving Paper Mills Corporation entered into an agreement with Erving in accordance with the provisions of the 1972 Act; on March 4, 1974, Baldwinville Products, Inc., entered into a similar agreement with Templeton. Each agreement provided:

> "In the event that the Federal and/or State governments shall require reimbursement for monies advanced for the Project representing the Company's participation, then the Company shall make payments as required to fulfill the requirements of said Federal and/or State governments."

As contemplated by the agreements, Erving and Templeton received Federal grants of $3,169,000 and $4,776,016, respectively, for construction of the treatment facilities. The Erving plant began operation in 1977, the Templeton plant in 1979.

In 1977, Congress passed the Clean Water Act of 1977, Pub. L. 95-217, 91 Stat. 1566 (1977 Act), effective December 27, 1977, which imposed an eighteen-month moratorium on the collection of any ICR payments under the 1972 Act.[5] At the time of the 1977 moratorium on ICR payments, the taxpayer had not yet begun making payments in connection with its use of the Erving treatment plant. At the time the Templeton plant began operation in 1979, the moratorium was already in effect, and, similarly, no ICR payments were made by the taxpayer. In December, 1979, the moratorium was extended for another year by Pub. L. 96-148, 93 Stat. 1088. On October 21, 1980, Congress enacted Pub. L. 96-483, 94 Stat. 2360, which repealed

---

[4]Regulations promulgated under the 1972 Act specifically required that "[t]he first payment by an industrial user shall be made not later than [one] year after such user begins use of the treatment works." 40 C.F.R. § 35.928-1(c) (1974).

[5]The moratorium afforded Congress an opportunity to "study the efficiency of, and the need for, the payment by industrial users of any treatment works." Pub. L. 95-217, § 75(a), 91 Stat. at 1609.

the ICR provision, 33 U.S.C. § 1284(b)(1)(B), retroactively to December 27, 1977, thereby eliminating entirely the taxpayer's obligations under the ICR provisions. Accordingly, no repayments were ever made by the taxpayer.

In 1981, 1982, and 1983, the taxpayer filed applications for corporate income tax abatements for the 1977, 1978, and 1979 tax years, respectively, on the theory that, as an accrual basis taxpayer, it was entitled to treat the ICR obligations as a liability for those years. The taxpayer asserted its claim to abatements even though there had been a complete moratorium on repayment during those years, followed by a total elimination of the repayment requirement in 1980. On February 12, 1988, the Commissioner of Revenue denied each of the taxpayer's applications for abatement. The taxpayer petitioned the board and a hearing was held before the board on January 22 and January 23, 1991. On September 30, 1993, the board issued a decision denying the applications for abatement. The taxpayer then requested a report and findings of fact, which the board issued on April 22, 1997. The present appeal was filed thereafter.

2. *Discussion.* A decision of the board will not be reversed or modified if it is based on substantial evidence and a correct application of the law. "In reviewing mixed questions of fact and law, the board's expertise in tax matters must be recognized, and its decisions are due 'some deference.' " *Koch* v. *Commissioner of Rev.*, 416 Mass. 540, 555 (1993), quoting from *McCarthy* v. *Commissioner of Rev.*, 391 Mass. 630, 632 (1984). Substantial evidence has been defined as "such evidence as a reasonable mind might accept as adequate to support a conclusion." *New Boston Garden Corp.* v. *Assessors of Boston*, 383 Mass. 456, 466 (1981). Our review of the sufficiency of the evidence is limited to "whether a contrary conclusion is not merely a possible but a necessary inference from the findings." *Olympia & York State St. Co.* v. *Assessors of Boston*, 428 Mass. 236, 240 (1998), quoting from *Commissioner of Rev.* v. *Houghton Mifflin Co.*, 423 Mass. 42, 43 (1996).

The taxpayer argues that it was the de facto owner of the treatment plants and, as such, it was entitled to capitalize the total amount it owed as assets, that its contractual obligations to pay the Federal debts were liabilities that existed during the 1977 through 1979 tax years, and that it was entitled to claim depreciation and investment tax credits. We do not directly address the taxpayer's claim that it was the de facto owner of the

plants and thus entitled to claim depreciation and investment tax credits. This is so because we have determined that the taxpayer was not entitled to deduct its annual contractual obligations (whether viewed as a loan or as "user costs") even though its accounting was on an accrual basis. Accordingly, the taxpayer is not entitled to depreciation or investment tax credits.

Under the accrual method of accounting, whether a liability is deductible is governed by the "all events" test. *United States* v. *General Dynamics Corp.*, 481 U.S. 239, 242 (1987). The test provides that a liability is deductible as an expense for the taxable year in which all the events have occurred that determine the fact of liability, so long as the amount can be ascertained with reasonable accuracy. *Id.* at 243. See *United States* v. *Anderson*, 269 U.S. 422, 441 (1926); *United States* v. *Hughes Properties, Inc.*, 476 U.S. 593, 600 (1986). Further, "expenses may be deductible before they have become due and payable [as long as] liability [has been] firmly established." *United States* v. *General Dynamics Corp.*, *supra* at 243. Thus, under the "all events test" the pivotal issue is whether the taxpayer had a firmly established obligation to pay the liability at the close of the tax year.

Under the 1972 Act, the taxpayer was required to start making payments for its share of the use of the facility within one year after it began use of the treatment works. See note 4, *supra*. By 1977, the year that the Erving wastewater treatment facility commenced operation, Congress had enacted the eighteen-month moratorium on ICR payments. Therefore, the taxpayer had no obligation to pay in 1977, and the liability did not accrue to the taxpayer. See *United Merchs. & Mfrs., Inc.* v. *Aiken County Pub. Serv. Authy.*, 766 F.2d 151, 154 (4th Cir. 1985).[6] Similarly, no payments were ever required as to the Templeton plant which opened in 1979, at which time the moratorium was already in effect.

---

[6] The taxpayer's contention that the board's reliance on the *United Merchants* case is erroneous, because the Fourth Circuit did not indicate whether the plaintiffs in that case were accrual basis taxpayers or cash basis taxpayers, is without merit. Under the circumstances of the present case, as in *United Merchants*, the taxpayer's payments under the ICR provision "[were] not due until one year after the facility had been placed in operation." See *United Merchants*, 766 F.2d at 154. In the present case, the first payments became due during the initial moratorium period and were eventually forgiven in 1980. For the reasons set forth in our analysis, these payments remained contingent and unaccrued until, ultimately, they were eliminated.

A contingent liability may be deductible if the contingent event which would dispose of the liability is an "extremely remote and speculative possibility." See *United States* v. *Hughes Properties, Inc.*, 476 U.S. at 601-602. However, in the present case, it cannot be said that the taxpayer had an unconditional obligation to pay at the end of the tax years in question. The possible forgiveness of the ICR payments was more than an "extremely remote and speculative" possibility during that period of time. While we recognize that even reasonable conjecture concerning whether the Federal government would require repayment under the ICR does not render an otherwise fixed liability contingent, see *United States* v. *General Dynamics Corp.*, 481 U.S. at 244-245, we conclude that the elimination of the taxpayer's obligation to make ICR payments was not an "extremely remote and speculative possibility" at the end of the 1977, 1978, and 1979 tax years. See *United States* v. *Hughes Properties, Inc.*, 476 U.S. at 601. Certainly there were strong indications that Congress was reconsidering the necessity of the ICR provisions. See note 5, *supra.* The taxpayer's obligation to repay the Federal grant money was not fixed, certain, and unconditional at the end of the tax years in question, as Congress had enacted a moratorium which relieved the taxpayer of any repayment obligation for a specified period, culminating in the complete repeal of the ICR provisions. Therefore, the ICR payments cannot be considered an accrued liability of the taxpayer during that time. See *Denver & Rio Grande Western R.R.* v. *United States*, 505 F.2d 1266, 1269-1270 (Ct. Cl. 1974).

We do not adopt the taxpayer's view that the extended moratorium simply deferred its unconditional repayment obligation to a later date. Based on the language of the agreements between the taxpayers and the towns, the Federal moratorium placed on ICR repayments, and the eventual elimination of any repayment obligation, the board's conclusion that, at all relevant times, the taxpayer's obligation remained contingent upon the Federal government requiring repayment of the Federal grants is supported by substantial evidence and represents a correct application of the relevant law.

*Decision of the Appellate Tax
Board affirmed.*