## CHARLES J. FOX *vs.* COMMISSIONER OF REVENUE.

No. 98-P-1537.

Suffolk. February 1, 2001. - April 12, 2001.

Present: ARMSTRONG, C.J., PERRETTA, & MASON, JJ.

*Administrative Law,* Administrative Procedure Act, Decision, Hearing, Proceedings before agency, Substantial evidence. *Taxation,* Sales tax.

The Appellate Tax Board erred in deciding an appeal from the denial of an abatement of taxes, in circumstances in which the board member who heard the evidence did not participate in the decision and in which the credibility of the witnesses was in issue with respect to who had control over the taxpaying entities; the board had no basis to make a determination with respect to credibility: the decision was vacated and the matter was remanded for further proceedings. [341-344]

There was no merit to a taxpayer's claim that the Appellate Tax Board applied an incorrect legal standard in determining a tax abatement claim. [344]

Substantial evidence supported the Appellate Tax Board's imposition of liability during three tax quarters for certain corporate taxes on the individual who controlled the corporations [344]; however, with respect to two other tax quarters there was no evidence to support liability of the individual, and the taxpayer was entitled to a decision in his favor for those quarters [344-345].

APPEAL from a decision of the Appellate Tax Board.

*John G. Neylon* for the taxpayer.

*Daniel J. Hammond,* Assistant Attorney General, for Commissioner of Revenue.

MASON, J. Charles J. Fox appeals from the decision of the Appellate Tax Board (board) affirming the decision of the Commissioner of Revenue (commissioner), made pursuant to G. L. c. 62C, § 31A, that he was personally and individually liable for the payment of sales taxes owed by Consolidated Graphics Corporation (Congraf) and New England Lithograph Company,

Inc. (Nelco).[1] His primary argument on appeal is that, because the board member who heard the evidence did not participate in the board's decision, it cannot stand. He also claims that the board's decision is based upon an erroneous interpretation of G. L. c. 64H, § 16, and that its factual findings are unsupported by substantial evidence. Because the board member who served as the hearing officer did not participate in the ultimate decision of the board, we vacate the board's decision and remand the action for further proceedings consistent with this opinion.

*The controversy.* General Laws c. 64H, § 16, as amended by St. 1976, c. 415, § 77, provides that any person who is "under a duty to pay over the [sales] taxes imposed by this chapter," but fails to pay over such taxes shall be "personally and individually liable therefor to the commonwealth." As set out in 830 Code Mass. Regs. § 62C.31A.1(2) (1988), a duty to pay over taxes is defined as an "obligation to remit taxes that arises from a person's position, function, or responsibility undertaken on behalf of a corporation."

After a hearing before the person who was then chairman of the board, Timothy O'Brien, in August, 1995,[2] the board found and concluded that Fox was responsible for the unpaid taxes principally because he had "exerted significant control and authority" over the companies' financial operations and disbursement of funds throughout the period in question, and had actively directed which creditors were to be paid while ignoring the companies' sales tax liabilities.

*Background.* The background facts are not in dispute. Prior to November, 1989, Fox was president, chief executive officer, and treasurer of Congraf, a private company that had its offices in Needham Heights. Congraf was in the business of designing and printing annual reports for public companies and undertaking other commercial printing projects. Fox was also chief executive officer and treasurer of Nelco, a wholly owned

---

[1]Throughout this opinion, we collectively refer to Congraf and Nelco as "the companies."

[2]Pursuant to the board's governing statute, G. L. c. 58A, hearings may be held before less than a majority of the board. See G. L. c. 58A, § 8. The board is then required to render a decision and, if one of the parties so requests, make findings of fact and a report thereon in writing. See G. L. c. 58A, § 13.

subsidiary of Congraf. Fox owned one-third of Congraf's stock, and he also held the voting rights to another one-third of Congraf's stock pursuant to an agreement with the owner of that stock, George Comeau.[3]

As chief executive officer and treasurer of the companies, Fox had authority to sign checks on both companies' bank accounts. He was also responsible for overseeing both companies' financial affairs, including the regular filing of sales tax returns. An employee of Congraf, Catherine Vaghida, would prepare these returns and present them to Fox for his signature together with a check in payment of the amount due. In May of 1989, in connection with a request for an extension of time to remit payment of the taxes then due, Fox sent a letter to the Department of Revenue in which he stated that he was the responsible officer at Congraf and Nelco for the payment of such taxes.

Throughout this period, Congraf had a depository and loan relationship with Old Stone Bank (bank) in Providence, Rhode Island, pursuant to which the bank would regularly lend Congraf eighty per cent of the value of its accounts receivable. In November, 1989, however, the bank became concerned that Congraf had been presenting it with false invoices, that is, invoices for work which had not yet been performed and might never be performed. Consequently, representatives of the bank, including Executive Vice President Michael Marques and Vice President Kevin McDevitt, met with Fox. They asked him to hire one of several independent consultants whom they recommended for purposes of providing advice to Fox as well as ensuring that the information provided to the bank would be accurate. Fox agreed to this request and subsequently hired Jonathan Altman from among the independent contractors the bank had recommended.

Altman spent one day a week at Congraf analyzing invoices and recommending cost cuts. He was paid by Congraf and reported directly to Fox. At or about this time, Vaghida resigned and Altman helped Fox hire her replacement, Joseph Schiappa. Schiappa served as Congraf's comptroller and was generally

---

[3]Comeau was chairman of Congraf's board of directors, but was close to retiring from the company.

responsible for, among other things, preparing cash flow and financial statements, collecting receivables, paying vendors, and speaking with representatives of the bank on a daily basis about the status of the bank's loans to Congraf and Nelco and possible overdrafts in their various bank accounts. Like Vaghida, Schiappa was also responsible for preparing sales tax returns for the companies.

Altman resigned from his employment with Congraf in May, 1990. In November, 1990, Congraf, again acting on the bank's recommendation, hired David Halperin, a member of a consulting firm named Cambridge Meridien Group, to be a full-time consultant with the companies. At that time, Schiappa was appointed chief financial officer of Congraf.

In January, 1991, Schiappa resigned from his employment with Congraf. In April, 1991, Congraf hired Richard Zwetsch as its chief financial officer. A few weeks after he joined Congraf, Zwetsch discovered that neither Congraf nor Nelco had prepared or filed sales tax returns for any of the quarters of 1990, or for the first quarter of 1991. As a result, Congraf had an outstanding liability of approximately $270,000 for such taxes, and Nelco had an additional outstanding liability of approximately $80,000. Zwetsch immediately brought these outstanding liabilities to the attention of Fox and Halperin. Fox or Zwetsch asked the bank to provide additional funds to pay the taxes, but the bank refused, insisting that it would provide funds only to pay current sales taxes that were due going forward, and would not advance any funds for prior liabilities.

In May of 1991, the companies filed sales tax returns for the prior five quarters with the Department of Revenue, but did not include any payment with the returns. The commissioner, acting pursuant to G. L. c. 62C, § 31A, determined that Fox had a duty to pay the unpaid sales taxes within the meaning of G. L. c. 64H, § 16, and assessed them against Fox. Fox applied to the commissioner for an abatement of the taxes and then appealed to the board from the commissioner's refusal to abate the assessed taxes. A hearing before the then chairman of the board, Timothy O'Brien, was held on August 2 and 3, 1995.

*The evidence.* Fox testified at the hearing that at the time Altman and Schiappa were hired in November, 1989, the bank's

representatives requested that he no longer participate in the financial affairs of the companies and, instead, concentrate solely on making sales. He stated that he complied with the bank's request because he was fearful that the bank might terminate its loans to the companies and cause him to be prosecuted for bank fraud, which in fact subsequently happened. Fox related that, in response to the bank's request, he stopped signing checks for a period of approximately six months, although he retained the power to do so. He resumed signing (but not preparing) checks only after Comeau and Frank Nappa, Congraf's general manager, refused to continue doing so. Fox also stated that he ceased any active participation in any of the companies' other financial affairs, except to meet with customers when necessary to collect accounts and to sign personal guarantees for the companies' loans.

Fox's version of the facts was disputed by Schiappa. Schiappa testified that he regularly consulted with Fox with respect to the financial affairs of the companies, including the payment of vendors. More specifically, Schiappa testified that he prepared a list every month showing the amounts then payable to the companies' various vendors, including those who were no longer doing business with the companies. Fox would then indicate on the lists which vendors should be paid. According to Schiappa, Fox directed him to continue making lease payments on eleven different vehicles, even though Schiappa urged that the payments be stopped.[4] Fox also directed him to pay a credit card bill for his (Fox's) daughter, notwithstanding the fact that the bill included charges for her apartment.

Schiappa further testified that, while Fox directed him to pay the foregoing and other bills, Fox never directed him to pay the sales taxes that were due. This was in spite of the fact that Schiappa regularly advised Fox that such sales taxes were in fact due and unpaid.

*The board's decision.* Following the hearing, O'Brien's term as chairman of the board terminated and he was replaced by

---

[4]Three of those vehicles included a Cadillac, a Mercedes, and a Porsche for, respectively, Fox, his wife, who was employed as a consultant for the companies, and his daughter, who was employed as a sales person for the companies.

Kenneth W. Gurge. On October 29, 1997, the board issued a decision for the commissioner that was signed by the then current members of the board. Subsequently, in response to Fox's request, the board on June 30, 1998, issued a report. The report set forth numerous findings of fact, and then explained that the board had found Fox responsible for the unpaid taxes principally because he had exerted "significant control and authority" over the companies' financial operations and disbursement of funds throughout the period in question, and had actively directed which creditors to pay while deliberately ignoring the companies' sales tax liabilities. The report was signed only by the then chairman, Gurge.

1. *Improper decision.* There is no general requirement under the Commonwealth's Administrative Procedure Act, G. L. c. 30A, §§ 1 et seq., or otherwise[5] that the officer who hears the evidence in a proceeding before an administrative agency must participate in the agency's decision in the matter. The Supreme Judicial Court has repeatedly indicated, however, that such participation is required where the credibility of witnesses is at issue. For example, in *Salem* v. *Massachusetts Commn. Against Discrimination*, 404 Mass. 170 (1989), the court affirmed an order vacating a decision by the Massachusetts Commission Against Discrimination where it appeared that, after the commission member hearing the evidence in a case of alleged intentional racial discrimination had died following the hearing, the commission had designated another member to render a decision based solely on a review of the record. In reaching this result, the court noted that the parties' testimony before the original hearing commissioner was conflicting in several respects and that the second commissioner "could not evaluate the credibility of the witnesses without observing their demeanor when testifying." *Id.* at 175. See *Dowd* v. *Director of the Div. of Employment Security*, 390 Mass. 767, 771 (1984). Contrast

---

[5]By St. 1968, c. 120, § 1, the board was exempted from G. L. c. 30A. See c. 30A, § 1(2). The board's procedures are governed by 831 Code Mass. Regs. §§ 1.01 et seq. (1996). See 831 Code Mass. Regs. § 1.37(1) ("Except as herein provided, the practice and procedure before the [b]oard shall conform to that heretofore prevailing in equity causes in the courts of the Commonwealth prior to the adoption of the Massachusetts Rules of Civil Procedure").

*Amherst-Pelham Regional Sch. Comm.* v. *Department of Educ.,* 376 Mass. 480, 498 (1978).

In the present case, as the board itself recognized, Fox could not be held liable for the companies' unpaid sales taxes unless he retained significant control over the companies' financial affairs throughout the period in question. See *Commissioner of Rev.* v. *Brown,* 424 Mass. 42, 44-45 (1997) (noting close parallel between State and Federal statutes concerning individual's duty to pay over taxes owed by corporation, and holding that person who was a minority shareholder, treasurer, and director of a private company was not as a matter of law a person responsible for paying over company's sales taxes where person had no day-to-day management duties or decision-making authority over disbursement of company's funds). See also *Vinick* v. *Commissioner of Int. Rev. (Vinick I),* 110 F.3d 168, 172 (1st Cir. 1997) ("At bottom, in order to be responsible, an individual must have had significant control over the financial affairs of the company"); *O'Connor* v. *United States,* 956 F.2d 48, 51 (4th Cir. 1992) ("[A] party cannot be presumed to be a responsible person merely from titular authority. . . . The focus must instead be on substance rather than form"). The board found that Fox did retain such control, relying principally on Schiappa's testimony to the effect that Fox regularly met with him and directed which creditors to pay, while ignoring the companies' sales tax liabilities.

Schiappa's testimony, however, was directly contradicted by Fox's testimony. Thus, Fox specifically denied that he ever directed Schiappa to pay any particular creditors. Fox also testified that, after November, 1989, he did not retain any authority to decide which creditors should be paid, or otherwise participate in the companies' financial affairs. There was no testimony or documentary evidence on these issues, other than the testimony of Fox and Schiappa.[6]

As in *Salem* v. *Massachusetts Commn. Against Discrimina-*

---

[6] While other witnesses appeared before the board, including Altman, Zwetsch, Nappa, McDevitt, who was vice president of the bank, and Francis J. DiMento, a lawyer who was advising Fox in February, 1990, none of these other witnesses had any personal knowledge with respect to the day-to-day interchange, if any, between Fox and Schiappa, or which of them was deciding which creditors would be paid. Altman testified only that he had been told

*tion, supra,* the board could not evaluate the credibility of the witnesses without observing their demeanor when testifying. Yet it does not appear from the record that any member participating in the board's decision actually attended the board's hearing. It thus appears that the board here did exactly what the Supreme Judicial Court held in *Salem* was not permitted. The board's decision, therefore, was fundamentally flawed and must be vacated. 404 Mass. at 174-175. See *Adams v. Industrial Commn. of Ariz.,* 147 Ariz. 418, 421 (Ct. App. 1985) (where "the administrative decision-maker and this court are . . . reaching a decision upon the 'cold record' the integrity of the legal process not only falters, it fails"); *American Welding Supply Co.* v. *Department of Rev.,* 106 Ill. App. 3d 93, 98-99 (1982) ("[w]e agree that if the evidence before a hearing officer or examiner is in such conflict that the weight and credibility to be given the testimony of various witnesses is the determining factor, due process may require that the examiner participate in the decision by submitting a report of his conclusions and impressions").

In reaching this result, we do not mean to imply that the member of the board presiding at a hearing actually must author the board's decision or that each member of the board personally must observe the witnesses' conduct and demeanor. On the contrary, in general we perceive no difficulty when an individual or group other than the hearing officer prepares findings provided it also appears either that (a) the hearing officer participated in the board's deliberations in a meaningful manner, see, e.g., *Stilson* v. *Board of Assessors of Gloucester,* 385 Mass. 724, 731 (1982); *Rabinovitz* v. *Commissioner of Rev.,* 396 Mass. 133, 135-136 (1985), or (b) credibility or evidentiary weight determinations are inessential to the board's decision. See *Amherst-Pelham Regional Sch. Comm.* v. *Department of Educ.,* 376 Mass. at 498. Where, however, resolution of essential conflicting factual claims depends upon credibility determinations, the board's hearing officer must materially

---

by Schiappa that Fox was deciding which creditors would be paid. McDevitt, on the other hand, testified that he understood that Altman was in control of all the companies' operations during the months that Altman was employed by the companies.

participate in the board's deliberations. See *Salem, supra.* Compare *Board of Appeals of Maynard* v. *Housing Appeals Comm.*, 370 Mass. 64, 66 (1976) (upholding committee's decision where one committee member attended all the hearings, another attended some and read transcript, and the third relied exclusively on the transcript).

2. *Other asserted deficiencies.* Fox asserts that the board applied an incorrect legal standard because it failed to consider as a prerequisite to liability for the companies' unpaid sales taxes actual responsibility for the payment of such taxes as part of his job duties or function within the companies. Fox offers no support for this proposition, and we decline to adopt it. We think the board could properly find Fox liable for the companies' unpaid taxes regardless of whether paying such taxes was part of his specific job duties. See *Vinick I,* 110 F.3d at 172. See also *Hochstein* v. *United States*, 900 F.2d 543, 547 (2d Cir. 1990) ("The central question, however, is whether the individual has significant control over the enterprise's finances"); *Morgan* v. *United States*, 937 F.2d 281, 284 (5th Cir. 1991) ("[t]he central question is whether an individual had the effective power to pay taxes").

Fox further asserts that, even assuming the board applied the correct legal standard, there was no substantial evidence supporting the board's imposition of liability on him for the entire period when the companies' sales taxes were unpaid. This assertion is likewise erroneous at least for the first three quarters of 1990. With respect to this period Schiappa testified unequivocally, as we noted previously, that he regularly met with Fox and Fox instructed him as to which creditors to pay, while ignoring the companies' outstanding sales tax liabilities. Assuming it had been properly accepted by the board, Schiappa's testimony constituted substantial evidence to support the board's imposition of liability on Fox for those periods. See *A.W. Chesterton Co.* v. *Commissioner of Rev.*, 45 Mass. App. Ct. 702, 708-709 (1998); *Erving Paper Mills Corp.* v. *Commissioner of Rev.*, 49 Mass. App. Ct. 14, 17 (2000).

The situation is different, however, with respect to the final quarter of 1990 and the first quarter of 1991. With respect to this latter period, Schiappa testified, consistent with Fox, that

David Halperin and Cambridge Meridien Group were in complete control of the companies' finances, as well as their other operations. More specifically, Schiappa testified that, as soon as Halperin and Cambridge Meridien Group were hired in November, 1990, they "pretty much were calling the shots in the financial area and — well, basically most of the company."

In light of this testimony by Schiappa, which was confirmed by Fox and not contradicted by any other witness,[7] there was no basis for the board to find Fox liable for the last quarter of 1990 or the first quarter of 1991. See Vinick v. United States (Vinick II), 205 F.3d 1, 11 n.8 (1st Cir. 2000) ("Because one's function and status can change between quarters, . . . it would be erroneous based solely on evidence from one quarter automatically to conclude that a person is responsible in another quarter"). With respect to this latter period, therefore, the board's decision must be reversed.

The decision of the board denying the abatement with respect to the first three quarters of 1990 is vacated and the case is remanded to the board for a new hearing with respect to those quarters. The decision of the board denying the abatement with respect to the final quarter of 1990 and the first quarter of 1991 is reversed and the case is remanded to the board with instructions to enter a decision for Fox with respect to those quarters.

*So ordered.*

---

[7]Schiappa's testimony was corroborated by Zwetsch. Thus, Zwetsch testified that, when he arrived at Congraf in April, 1991, Halperin was controlling the operations of the company's finance department and made "very clear to me . . . that we were to pay nothing other than what was needed to keep the business going." Zwetsch also testified that, while Fox accompanied him "once or twice" to meetings at the bank, Fox was asked questions at such meetings only about the sales efforts of the companies, and not their financial affairs.