## Mount Auburn Hospital *vs.* Board of Assessors of Watertown.

No. 00-P-1419.

Suffolk. April 18, 2002. - August 19, 2002.

Present: PORADA, SMITH, & KAFKER, JJ.

*Taxation,* Abatement; Real estate tax: abatement; Appellate Tax Board: jurisdiction; Assessors; Real estate tax: assessment; Exemption; Real estate tax: exemption. *Charity. Hospital.*

Where testimony in the appeal of a taxpayer from a decision of a town's board of assessors to revise the taxpayer's tax bill in the middle of a fiscal year was heard by a member of the Appellate Tax Board (board) who did not participate in the decision or report of the board, the board could determine that the taxpayer had paid its tax bill in person in a timely fashion, and that the board therefore had jurisdiction, in that the board members deciding and reporting the appeal could reconcile the testimony of the taxpayer regarding its practices regarding the payment of tax bills with the testimony of the assistant town treasurer regarding the practices of its office in receiving and depositing tax payments to create a single, logical narrative that conferred jurisdiction upon the board. [616-618]

A town's board of assessors (assessors) did not have authority to revise a taxpayer's tax bill in the middle of a fiscal year merely because of a change in the composition of the membership of the assessors, where the revaluation was not meant to correct a clerical or data processing type of error, but rather was a substantive reconsideration of a deliberate decision, which reflected differences of opinion between the present and prior assessors. [618-619]

Where the taxpayer, a charitable hospital, purchased a parcel of land and a building with the intention of removing a substantial part of its charitable activities there, and where the purchase was less than two years before a decision by a town's board of assessors that none of the property was exempt from real estate taxation, the Appellate Tax Board (board) properly concluded that the property could be considered exempt from taxation within the meaning of G. L. c. 59, § 5, Third, despite the fact that the taxpayer did not intend to remove its entire operation to the new site [619-620]; further, the board's finding that no more than fifty per cent of the new property was intended to be used for charitable purposes, and that only fifty per cent of the property was therefore exempt, was supported by substantial evidence [620], and the exemption in the statute for real estate owned by a charity and occupied by it did not dictate a different result [620-622].

APPEAL from a decision of the Appellate Tax Board.

*Daryl J. Lapp* for the taxpayer.

*Ellen M. Hutchinson* for Board of Assessors of Watertown.

KAFKER, J. The taxpayer, Mount Auburn Hospital (hospital), which is based in Cambridge, purchased over eleven acres of land and a 440,000 square foot building at 705 Mount Auburn Street in Watertown (property) in September, 1991. The hospital, which only occupied part of the building, appealed the real estate taxes assessed against the property by the board of assessors of Watertown (assessors) for fiscal years 1993 and 1994. After hearing the evidence, the Appellate Tax Board (board) granted abatements to the hospital for both years. Both the hospital and the assessors argue on appeal that the board erred in determining the amount of the abatements.

1. *Board decision.* A. *Hearings and report.* At two separate hearings in September, 1995, and January, 1996, board chairman Timothy O'Brien heard testimony from eight witnesses. The witnesses included the hospital's president, vice-president and chief financial officer, two current and two former assessors for the town of Watertown, and a real estate consultant employed by the hospital. In addition, deposition testimony from two other witnesses and extensive documentary evidence were admitted. The board's single-page decision, dated August 25, 1997, ordered abatements for the hospital for both years. It was signed by five board members, including the new chairman, Kenneth Gurge, but the decision was not signed by O'Brien.[1] The board report, issued in June, 2000,[2] was authored by then chairman Abigail Burns, who was joined in the decision by two former and two current board members, who were the same individuals who signed the August, 1997, decision.

B. *Fact-finding.* The board found the following facts. The hospital's property consisted of approximately 11.297 acres of land occupied by a 440,000 square foot building surrounded by

---

[1]At the time the decision was issued, O'Brien's term on the board had ended and Gurge had succeeded to the chairmanship. See *Fox* v. *Commissioner of Rev.*, 51 Mass. App. Ct. 336, 340-341 (2001).

[2]The board need not issue findings of fact and report thereon, unless the parties so request within ten days of the issuance of the board decision. G. L. c. 58A, § 13. 831 Code Mass. Regs. § 1.32 (1996). *Bayer Corp.* v. *Commissioner of Rev.*, 436 Mass. 302, 306 n.5 (2002).

495 paved parking spaces. Prior to the purchase of the property, the hospital had formed a facilities task force which concluded that the hospital needed additional facilities at a different site to alleviate "pressing space constraints at its existing facility." The task force also determined that the hospital should relocate its outpatient services to a new site.

Over a three-year period, the hospital spent over $550,000 on planning studies and considered several divergent scenarios for its use of the property. Minutes of the weekly meetings of the hospital's project coordinating committee, which was formed after the purchase and which met at the property, reflect that the hospital considered either using all the space, or using about one-half of the building space and leasing, "mothballing," or demolishing the remainder. By late 1992 through the spring of 1993, the hospital "focused on a development option that proposed using part of the building for tax exempt hospital purposes, part for non-exempt medical offices, and mothballing the remaining portion." The board found that, as of the date of purchase, as well as of July 1, 1993, the hospital intended to use approximately fifty percent of the new site for its charitable purposes.

The hospital never reached a final decision regarding its use of the property for the tax years of 1993 and 1994, due to "rapid changes that were occurring in the health care industry at the time." The board found that at all relevant times, the hospital used "about eighteen percent of the building for medical record storage,[3] another one percent for weekly meetings, and about seventy-five percent of the available parking spaces, that is, 375 out of 495 spaces, for hospital personnel."[4] The combined total of all the hospital's use "comprise[d] well less than fifty percent of the subject property's space," the board noted.

C. *Fiscal year 1993: assessors' valuation, revised bill, and board ruling.* In fiscal year 1993, the assessors valued the property at $10,290,600, but determined initially that 84.62

---

[3]This consisted of an 80,000 square foot storage room.

[4]All but two of the 375 parking spaces were used by hospital personnel working at the hospital's main campus in Cambridge.

percent of the property was tax exempt, leaving only 15.38 percent of the property taxable. The taxable portion of the property was that space occupied by an office of the United States Postal Service, under a commercial lease agreement with the hospital. At a rate of $21.50 per $1,000 of assessed valuation, the hospital's total tax liability on the property for the fiscal year was $34,023.94. In June, 1993, the assessors issued a revised fiscal year 1993 tax bill on the property, imposing a tax on fifty percent of assessed value of the property, with a new amount due of $110,623.95. The revised bill was issued following a change in membership of the board of assessors, when the terms of two of the three members expired, and two new members assumed their duties. The new members determined that only fifty percent, not 84.62 percent, of the property should be exempt from taxation in fiscal year 1993.

As a threshold matter, the board considered whether the hospital's payment of the revised fiscal year 1993 bill was received before any interest was incurred, i.e., no later than July 19, 1993, a prerequisite to board jurisdiction to hear a taxpayer's appeal. G. L. c. 59, § 64. The evidence on the timing of the hospital's payment was circumstantial. The hospital's check was dated July 16, 1993. As to the payment date, the assessors offered the deposition testimony of the town's assistant treasurer. She stated that the town's records showed a payment date of July 20, 1993, but acknowledged that checks received after 12:00 P.M. but before 5:00 P.M. were deposited into the bank on the day following receipt. The check was deposited by the town on July 20, 1993. The hospital's chief financial officer, Dana Diggins, testified generally to the procedures by which the hospital's tax bills were paid. He stated that after purchasing the property, the hospital hand-delivered every tax payment to the town, to insure they were paid on time. He acknowledged, however, that he was unable to determine which of his staff members delivered the particular check in question, and was unable to find a receipt showing when the bill was paid. Harmonizing the two versions of the parties' practices, the board determined that the hospital's payment was made "after

noontime but before 5:00 P.M. on July 19, 1993."[5] The board therefore retained jurisdiction of the matter.

The board went on to rule that the assessors had exceeded their authority when they imposed a revised tax on the property for fiscal year 1993, and that the hospital therefore owed only the tax originally assessed, which reflected an exemption on 84.62 percent of the property's value. The assessors' revised 1993 tax bill, according to the board, was not aimed at correcting a clerical, data processing, or other ministerial error as authorized by G. L. c. 59, § 76, but reflected the considered decision of the new members of the board of assessors to change the level of taxation on the property in the middle of a fiscal year. They did so, the board found, after conducting a new and "substantial investigation," including interviews of hospital personnel and site visits. The board therefore ordered abatement of the $76,600.01 assessed by the revised tax bill.

D. *Fiscal year 1994: assessors' valuation and board ruling.* The assessors determined that in fiscal year 1994, none of the property, which was then valued at $9,448,500, was exempt from taxation. The tax was assessed at a rate of $22.08 per $1,000 of valuation in the amount of $208,622.88. The board ruled that the hospital's intended use of fifty percent of the property for the removal of some of its existing charitable services fit within the exemption provided by G. L. c. 59, § 5, Third, and "coupled with the proportionate exemption rule, was enough to qualify the property for a partial exemption." The abatement for fiscal year 1994 was $104,311.44.

2. *Discussion.* A. *Review standards.* "Normally all property of a taxable nature should contribute its proportionate share to the support of the State." *Boston Chamber of Commerce* v. *Assessors of Boston,* 315 Mass. 712, 716 (1944). A taxpayer has the burden of establishing its right to an exemption, *Assessors of Boston* v. *Garland Sch. of Home Making,* 296 Mass. 378, 384 (1937), and to do so must show that it "comes within either the express words or the necessary implication of some statute

---

[5]The board noted that its finding "acknowledged the [hospital]'s business practice for tax payments and also addressed why the Tax Collector's deposit of the [hospital]'s tax payment was actually made on July 20, 1993, and not July 19, 1993."

conferring this privilege." *Animal Rescue League of Boston* v. *Assessors of Bourne,* 310 Mass. 330, 332 (1941). Any doubt in the application of an exemption statute operates against the party claiming tax exemption. *Boston Symphony Orchestra, Inc.* v. *Assessors of Boston,* 294 Mass. 248, 257 (1936).

A decision of the board is upheld as long as "it is based on a correct application of the law and if it is based on substantial evidence." *Kennametal, Inc.* v. *Commissioner of Rev.,* 426 Mass. 39, 43 (1997), cert. denied, 523 U.S. 1059 (1998). "Resolution of conflicts in evidence and the credibility of the witnesses is in the province of the board." *Bayer Corp.* v. *Commissioner of Rev.,* 436 Mass. 302, 307 (2002). "To the extent that the question [before it] is one of fact, the board's findings are entitled to deference, so long as there is substantial evidence in the record to support [them]." *Tambrands, Inc.* v. *Commissioner of Rev.,* 46 Mass. App. Ct. 522, 526 (1999). On the other hand, "evidence of a party having the burden of proof [in this case, the hospital] may not be disbelieved without an explicit and objectively adequate reason." *Tennessee Gas Pipeline Co.* v. *Assessors of Agawam,* 428 Mass. 261, 267 (1998), quoting from *New Boston Garden Corp.* v. *Assessors of Boston,* 383 Mass. 456, 470-471 (1981).

B. *Fiscal year 1993.* At oral argument, but not in their briefs, the assessors argued that the board could not properly decide the issue of whether the hospital's fiscal year 1993 payment was made timely.[6] The assessors claim that the board's decision depended on an evaluation of the credibility of witnesses who testified, specifically Dana Diggins, the hospital's chief financial officer. Diggins's testimony was heard by chairman O'Brien, who presided at the hearings, but did not participate in the decision or report of the board. The assessors' challenge must be resolved: timely payment by the hospital is required for the board to have jurisdiction to hear the appeal. G. L. c. 59, § 64. *Stilson* v. *Assessors of Gloucester,* 385 Mass. 724, 732 (1982). We therefore consider the matter despite the assessors' failure to raise it in their appellate briefs.

---

[6]In a letter to the court pursuant to Mass.R.A.P. 16(1), as amended, 386 Mass. 1247 (1982), the assessors cited *Fox* v. *Commissioner of Rev.,* 51 Mass. App. Ct. 336, 340-341 (2001), decided after briefing in this case, but before oral argument.

The board found that "during the relevant time period, the [hospital] had adopted a procedure to ensure the timely payment of its real estate bills and preservation of its real estate tax exemption." Diggins described the hospital's practice of paying each tax bill in person, and his instruction to a subordinate "to insure that every tax bill that is due is hand-delivered to the town." Absent "an explicit and objectively adequate reason," the board was not free to disbelieve the testimony of the hospital's witness, Diggins. *New Boston Garden Corp.* v. *Assessors of Boston*, 383 Mass. at 470-471. Nothing appearing in the record constitutes an objectively reasonable basis for disbelieving Diggins, whose testimony was uncontradicted by any other witness, on existence of the business practice.

While such testimony on its face could suffice as evidence before the board, it was followed by a candid acknowledgment that Diggins had no "unequivocal" proof that the protocol was followed in that instance.[7] Likewise, Diggins's assertion was arguably called into question by the deposition testimony of assistant treasurer White, who stated that the town records showed a payment date of July 20, 1993. She also acknowledged, however, that checks received after 12:00 P.M. but before 5:00 P.M. were deposited into the bank the following day. The check was deposited on July 20.

The situation is distinguishable from that existing in *Bayer Corp.* or *Fox.* In those cases, testimony of two witnesses directly conflicted, and the board was compelled to choose between two competing and mutually exclusive versions of the facts. *Bayer Corp.* v. *Commissioner of Rev.*, 436 Mass. at 307 (board forced to resolve conflicts in testimony of parties' witnesses relating to whether taxpayer was wrongfully assessed corporate excise

---

[7]The following exchange took place on cross-examination of Diggins:

Q: "Do you know if [the accounts payable supervisor at the time] had the specific responsibility of making sure this check got cut and this bill got paid?"

A: "No. That's the problem. There isn't unequivocal proof that everything followed that protocol; and that person no longer works at the hospital."

taxes). *Fox* v. *Commissioner of Rev.*, 51 Mass. App. Ct. at 342-343 (testimony of taxpayer's former employee contradicted that of taxpayer concerning latter's involvement in day-to-day financial decisions affecting his company). Here, in contrast, Diggins's and White's testimony, although suggestive of different conclusions, could also be reconciled, and, indeed, were reconciled by the board, into a single logical narrative.

We further reject the assessors' argument that Diggins's testimony on the hospital's business practices, because it evinced a lack of any personal knowledge of when the bill was paid, was insufficient to support the board's conclusion that payment was timely. See generally *A.W. Chesterton Co.* v. *Commissioner of Rev.*, 45 Mass. App. Ct. 702 (1998). As discussed above, (1) Diggins's testimony, coupled with (2) the town's practice of depositing checks received in the afternoon the following day were uncontradicted and adequate to satisfy the hospital's burden of proving payment on July 19, 1993. *New Boston Garden Corp.* v. *Assessors of Boston*, 383 Mass. at 470-471. We conclude the board properly exercised its jurisdiction in hearing the matter.

We also agree with the board's decision that the assessors did not have statutory authority to revise the fiscal year 1993 tax bill on the property due to a change in the composition of their membership. The assessors rely on G. L. c. 59, § 76, which provides, "If any property subject to taxation has been unintentionally valued or classified in an incorrect manner due to clerical or data processing error or other good faith reason, the assessors shall revise its valuation or classification." The board correctly found and ruled that " 'unintentional,' as used in § 76, means 'not done by design' or 'not intended,' " and that the "[a]ssessors' original valuation and determination regarding the extent that the subject property was tax exempt for fiscal year 1993 clearly were done by design and were intended." The plain meaning of the term "unintentional" is further defined by reference in the text of the statute to mistakes due to "clerical or data processing error," classic forms of inadvertent acts. Finally, as the board stated, "[i]n the context of § 76, the phrase 'other good faith reason' suggests a mistake similar to a clerical or data processing type of error." See *San-*

*tos* v. *Bettencourt*, 40 Mass. App. Ct. 90, 92 (1996); 2A Sutherland Statutory Construction § 47.17 (6th ed. 2000 & Supp. 2002). The assessors' revised fiscal year 1993 tax bill corrected nothing of the sort. Rather, it was a substantive reconsideration of a deliberate decision reflecting differences of opinion between present and prior assessors. As a result, the board's decision to abate the hospital's taxes back to the amount originally imposed was correct.

C. *Fiscal year 1994.* As provided by G. L. c. 59, § 5, Third, property exempt from taxation includes "real estate owned by . . . a charitable organization and occupied by it or its officers for the purposes for which it is organized . . . and real estate purchased by a charitable organization with the purpose of removal thereto, until such removal, but not for more than two years after such purchase . . . ."

The board relied on the removal exemption to grant the abatement, finding that the hospital purchased the property in September, 1991, "with the purpose of removal thereto."[8] It also found that as of July 1, 1993, the hospital's two-year grace period had not expired. Finally, it found that, as of July 1, 1993, as well as on the purchase date, the hospital intended to use only fifty percent of the Watertown property for charitable purposes, including the relocation of its outpatient services; the hospital's intentions, charitable or commercial, for the remaining fifty percent were unclear. We conclude that the board's underlying factual findings were supported by substantial evidence in the record. *Tambrands, Inc.* v. *Commissioner of Rev.*, 46 Mass. App. Ct. at 526.

We turn to the board's legal conclusions. The assessors contend that the removal provision does not apply because the hospital was not removing its entire operation to the new site. The statutory language on its face does not limit the exemption to a complete removal of a charitable institution from one site to another. The real estate was purchased by a charitable

---

[8]The assessors have not argued that the lack of participation by the hearing officer in the final decision or report requires a remand of the board's determination of the hospital's tax liability for fiscal year 1994. See *Salem* v. *Massachusetts Commn. Against Discrimination*, 404 Mass. 170 (1989). The argument is therefore waived. Mass.R.A.P. 16(a)(4), 367 Mass. 921 (1975).

organization with the purpose of removing a substantial part of its charitable activities to the new site. We conclude that this "comes within either the express words or the necessary implication" of the exemption. See *Animal Rescue League of Boston* v. *Assessors of Bourne*, 310 Mass. at 332. The policy reasons underlying the exemption — to allow two years in which to plan and realize the use of the new site — also apply here. The large site and building, the extensive removal contemplated, and the rapidly changing health care practice, required careful planning and outlay of substantial funds.[9]

We also affirm the board's conclusion that only fifty percent of the property is exempt. As stated above, the board's finding that no more than fifty percent of the new property was intended to be used for charitable purposes was supported by substantial evidence. We see no reason why the two-year removal provision should provide an exemption for charitable purposes for more than fifty percent of the property where the board has found no such intention regarding the use of the remainder of the property. This is particularly true here, where commercial use was already present and plans existed for further commercial development. As "[t]he rule of proportionate exemption . . . is now recognized as generally applicable in this State," *Lynn Hosp.* v. *Assessors of Lynn*, 383 Mass. 14, 18 (1981); see *Cambridge* v. *County Commrs. of Middlesex*, 114 Mass. 337, 339-340 (1874); *Milton Hosp. & Convalescent Home* v. *Assessors of Milton*, 360 Mass. 63, 70 (1971), we apply it in the removal context as well.

We next turn to the exemption for "real estate owned by . . . a charitable organization and occupied by it or its officers for the purposes for which it is organized." G. L. c. 59, § 5, Third.

---

[9]The assessors rely on *Wheaton College* v. *Norton*, 232 Mass. 141, 147 (1919), in which the court concluded that the words " 'purchased . . . with the purpose of removal thereto,' naturally mean a change in the situs of the institution from one tract of land to another, and do not mean other land purchased for college purposes." The facts in *Wheaton College*, however, did not involve the "removal" of any part of the college's operations from the original site to the new. Moreover, as the court emphasized, the land and buildings were being used by someone with no connection to the charitable organization at the relevant time. The *Wheaton College* decision is thus distinguishable on the facts, and the broad language quoted above is dicta not precluding an exemption for the substantial removal involved here.

The hospital contends that this exemption authorizes an abatement on the full value of the property, minus the approximately fifteen percent of actual commercial use. The assessors, in contrast, argue that the occupancy exemption only authorizes an abatement for the portion actually occupied for charitable purposes with the unused portion remaining taxable along with the portion leased to a commercial tenant.[10]

Relying on cases involving undeveloped land at boarding schools or colleges, the hospital contends that where a charitable organization actively uses property for charitable purposes the entire property so appropriated is exempt from taxation, even if a portion is not physically occupied by the organization. The problem with this analysis is that the undeveloped space in those cases was itself serving the charitable purposes of the institution for recreational and other needs of the students. See *Emerson* v. *Trustees of Milton Academy*, 185 Mass. 414, 417 (1904) ("[t]he pupils do in fact constantly use the unimproved parts of the fields"); *Wheaton College* v. *Norton*, 232 Mass. 141, 149 (1919) (woods and paths important for health and enjoyment of students). Here the unused space does not "contribute immediately to the promotion" of the hospital's charitable purposes. *Babcock* v. *Leopold Morse Home for Infirm Hebrews & Orphanage*, 225 Mass. 418, 422 (1917).

The hospital's argument that the occupancy exemption extends to all but the fifteen percent actually used for commercial purposes is particularly ill-suited to the facts of this case. As previously stated, the board has made a finding, supported by substantial evidence, that the hospital intended to use no more than fifty percent of the property for charitable

----

[10]There was substantial evidence to support the board's finding that the hospital was occupying eighteen percent of the building for medical records storage, another one percent for weekly meetings, and about seventy-five percent of the available parking spaces for hospital personnel, and that its total use comprised well less than fifty percent of the property's space. Although the assessors contend that the space was not being efficiently used, we do not apply a rule of "strict necessity." See *Massachusetts Gen. Hosp.* v. *Somerville*, 101 Mass. 319, 321-322 (1869); *Assessors of Dover* v. *Dominican Fathers Province of St. Joseph*, 334 Mass. 530, 540-541 (1956) (so long as organization's officers "act in good faith and not unreasonably in determining how to occupy and use the real estate of the corporation their determination will not be interfered with by the courts").

purposes. The property already involved a mixture of commercial and charitable uses, and commercial uses were among those being considered for the remaining fifty percent. Whether we turn to the cases regarding the occupancy exemption, see, e.g., *Boston Soc. of Redemptorist Fathers* v. *Boston*, 129 Mass. 178, 181-182 (1880), or the rule of proportionate exemption, see *Lynn Hosp.* v. *Assessors of Lynn*, 383 Mass. at 18, no more than the fifty percent or $104,311.44 abatement provided by the removal provision would be authorized by the occupancy exemption.[11]

We affirm the decision of the board regarding the abatement in fiscal year 1994, as well as fiscal year 1993.

*Decision of the Appellate Tax Board affirmed.*

---

[11]We need not decide, as the board held, that the occupancy exemption is limited to actual use. We note that the board relies on *Lynn Hosp.* v. *Assessors of Lynn*, 383 Mass. 14 (1981), a case that does not involve unused space. Other cases, however, have adopted a less rigid formulation focusing on the organization's intentions and diligence. See, e.g., *New England Hosp. for Women & Children* v. *Boston*, 113 Mass. 518, 521 (1873) (although construction had not commenced yet, planning had been undertaken with due diligence and the hospital had not leased the premises or derived a profit therefrom; exemption allowed); *Assessors of Hamilton* v. *Iron Rail Fund of Girls Clubs of America, Inc.*, 367 Mass. 301, 307 (1975) ("even somewhat equivocal expressions of an intention to occupy property for a charitable purpose are entitled to more weight in the case of an organization which has so occupied the property annually for many years than they are in the case of an organization which has never so occupied the property"). Contrast *Boston Soc. of Redemptorist Fathers* v. *Boston*, 129 Mass. at 181-182 (where plaintiff purchased a large parcel divided into two lots split by a private way, and western lot was unoccupied and the organization's intentions regarding the lot were "wholly indefinite" regarding the time it will be occupied, and equivocal regarding its use, western lot was taxable while occupied eastern lot was not).