404 Mass. 170 (1989)
534 N.E.2d 283
CITY OF SALEM
vs.
MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION & another.[1]
Supreme Judicial Court of Massachusetts, Essex.
November 10, 1988.
February 21, 1989.
Present: HENNESSEY, C.J., LIACOS, ABRAMS, NOLAN, & O'CONNOR, JJ.
Jean A. Musiker for Massachusetts Commission Against Discrimination.
Alan J. Rom for the intervener.
Mary P. Harrington for the plaintiff.
HENNESSEY, C.J.
In this case, the Massachusetts Commission Against Discrimination (MCAD) ruled that the Salem police department had violated G.L.c. 151B, § 4 (1), by denying Charles Tyrone Brown an appointment because of his race. The city of Salem appealed, and a Superior Court judge vacated the MCAD decision and remanded the matter to the *171 MCAD for a new hearing. Both the MCAD and Brown appealed. We now affirm the Superior Court judge's order.
The following evidence was received by Commissioner Daniel Steele at an MCAD hearing. In July, 1978, in order to fill four vacancies, the chief of the Salem police department, Charles J. Connelly, requested a list of eligible candidates from the Division of Personnel Administration (DPA). The police chief received a list of eligible candidates ranked according to their performance on the civil service qualifying examination. The listed candidates had to appear before the police department within ten days to sign the civil service list to indicate their willingness to accept an appointment. Brown was ranked first on the list, with the highest relative cumulative score on the examination, and appeared before the police chief promptly. Brown signed the list, which stated his address as 157 Lafayette Street, Salem. There was conflicting testimony from Brown and the police chief regarding the content of any conversation between them at that time. Brown testified that the police chief was unavailable and that he waited for more than one hour for an opportunity to speak with him. Brown also testified that he asked about his position on the list, and that the police chief told him he was first on the list. The police chief testified that he recalled asking Brown for a current address and telling him that there would be an interview.
Within twenty-one days, the police chief interviewed all of the candidates on the civil service list except Brown. The police chief testified that he did not have Brown's telephone number and that when he sent an officer to 157 Lafayette Street, Salem, the officer was informed that Brown had not lived there in over a year. The post office provided a forwarding address of 13 Bartlett Street, Beverly. The police chief instructed a police officer to inquire at that address but Brown could not be located.
Shortly after Brown signed the list, he went to Cleveland, Ohio, because his mother was in the hospital, and remained in Cleveland until December, 1978. His mail was being forwarded to a friend's house in Beverly. Brown testified that, while he was in Cleveland, he twice telephoned the police *172 chief. The police chief was not available for the first call. On the second call, sometime in September, Brown and the police chief spoke. There was conflicting testimony from Brown and the police chief regarding that conversation. Brown testified that he inquired about the appointment, which the police chief denied. The police chief testified that he told Brown that he had tried to contact him, wanted to see him, and that Brown should see him when he returned, all of which Brown denied.
On August 28, 1978, the police chief selected candidates numbered two, three, four, and nine from the civil service list for appointment. The mayor approved the appointments on August 31 and forwarded them to the DPA. The appointees reported for work in September, 1978, although they were not finally approved by the DPA until May, 1979.
When Brown returned from Cleveland in December, 1978, he did not talk to the police chief, but telephoned the DPA as often as twice a week from December, 1978, to March, 1979. The DPA consistently informed Brown that no appointments had been made. Finally, in late March, or early April, 1979, the DPA informed Brown that the appointments had been made in September, 1978.
In April, 1979, Brown filed a complaint with MCAD alleging that he had been bypassed for employment in violation of his right under G.L.c. 151B, § 4. In May, 1979, Brown also filed a complaint with the Civil Service Commission alleging that he had been unlawfully bypassed. Following two hearings at which Brown and the police chief testified, and after an appeal to the full commission, the Civil Service Commission in January, 1980, concluded that "... the appointing authority's reasons for bypassing ... [Brown] were sound and sufficient and were not discriminatory but were job-related."
The police chief testified as to why he chose the four candidates for appointment as entry level police officers. The first had served as a provisional officer in Salem and the police chief thought he performed well. The police chief had known the second candidate and his family for twenty years and the candidate had expressed a desire to become a police officer. The third candidate worked as a security guard and impressed *173 the police chief in the interview. The last candidate impressed him in the interview and spoke Polish fluently. The police chief further testified as to why he did not appoint Brown stating, "[i]t was [his] impression that it would be difficult to train this man as a police officer." The police chief also testified that Brown's former supervisor, dog Constable Donald Famico, and Salem police Lieutenant Francis J. Wrigley both volunteered unfavorable information about Brown. No unsolicited negative information was received on any other candidate. Some allegations concerned Brown's alleged use of abusive language and rudeness while an assistant dog officer. Brown testified that the incidents never occurred and that he had never been informed that any complaint had been filed. Another allegation regarded a confrontation Brown had with a Salem police officer. Brown did not dispute that the incident occurred and testified that the police chief had apologized to Brown for any misunderstanding and for Brown's being called "boy" by a Salem police officer. The police chief did not solicit Brown's version of the incidents.
On a civil service form, the police chief stated his reason for appointing candidates other than the one ranked highest on the list of eligible candidates: "After personal interviews with all eligible candidates, those selected were the most impressive." According to the civil service criteria, Brown was an eligible candidate. The police chief testified that he considered Brown ineligible because he could not be located for an interview.
There was additional testimony on the police department's hiring practices concerning members of minorities. There were none on the force when Connelly became chief but he had reportedly offered jobs to members of minorities during his tenure.
Commissioner Steele died after the MCAD hearing, but before making a decision. Pursuant to G.L.c. 30A, § 11 (7), and MCAD Rules of Procedure, 804 Code Mass. Regs. § 1.15(6) (1986), Commissioner Kenneth Cote was appointed to review the record and to issue a proposed decision. On September 21, 1982, Cote issued his findings of fact, conclusions *174 of law, and an order, finding that the Salem police department had violated G.L.c. 151B, § 4 (1), by failing to hire Brown because of his race. Cote further found that the evidence was insufficient to make a finding as to damages and ordered that the record be reopened for that limited purpose. After a reopened hearing in September, 1983, damages were ordered. Later, after both parties filed an appeal, the full commission affirmed the order of the single commissioner.
The city of Salem appealed to the Superior Court, which vacated the MCAD decision and remanded the matter to the MCAD for a new hearing. The MCAD and Brown appeal that order.
The Superior Court judge concluded that the practice of appointing a substitute hearing officer to issue a decision based on the record in the event the original hearing officer is unable to do so, under G.L.c. 30A, § 11 (7), and MCAD rule § 1.15(6), "is only acceptable and reasonable where the credibility of witnesses is not at issue.... A mere reading of the transcript is not an adequate substitute for actually observing and hearing the witnesses in determining credibility." See Amherst-Pelham Regional School Comm. v. Department of Educ., 376 Mass. 480 (1978); Perkins v. School Comm. of Quincy, 315 Mass. 47 (1953). We agree.
We have previously stated that "[w]hen a decision depends on choosing between conflicting versions of the material events, ... the review examiner needs more than just the record and a tape recording or transcript of the hearing." Dowd v. Director of the Div. of Employment Sec., 390 Mass. 767, 771 (1984).
In this case, only two witnesses testified, the police chief and Brown. Their testimony conflicted on issues material to determining whether Brown was wrongfully bypassed because of his race. Assessment of Brown's claim of racial discrimination necessarily required choosing one of two versions of a story, and thus required an evaluation of the credibility of the witnesses.
Commissioner Cote, who made the determinations of fact, rulings of law, and order, himself stated that he discounted *175 the police chief's testimony as not credible. Faced with conflicting testimony from Brown and the police chief, Commissioner Cote concluded that the police chief had not asked Brown to verify his address or his telephone number. Cote concluded that the police chief's statement, that he had selected the most impressive candidates after interviews with all eligible candidates, was a deliberate misrepresentation. Cote further stated that the police chief "knew, or reasonably should have known" that the factual basis of some of the unfavorable comments about Brown had "racial overtones." Cote further discredited the police chief's testimony that he had asked Brown to see him when he returned from Cleveland. According to Cote, "the unequal application by the [police chief] of the selection procedure, the racial character of a report relied upon by [the police chief], and the seriously suspect nature of Chief Connelly's credibility lead [Cote] to conclude that the [police chief's] articulated reason for [Brown's] rejection was pretextual."
Brown's allegations of racial bias required proof that the police department's reasons for not hiring Brown were a pretext. Wheelock College v. Massachusetts Comm'n Against Discrimination, 371 Mass. 130, 138-139 (1976). The police chief stated that his reasons for not hiring Brown were Brown's unavailability for an interview, and the unsolicited negative comments he received about Brown. Thus, whether the police chief asked for Brown's address or telephone number, and whether the chief knew of the racial overtones of the incident complained of were pivotal to an evaluation of Brown's allegations. There was no testimony or documentary evidence on these issues, apart from the testimony of Brown and the police chief.
Commissioner Cote could not evaluate the credibility of the witnesses without observing their demeanor when testifying. Compare Amherst-Pelham Regional School Comm. v. Department of Educ., supra at 498 (only hearing officer can judge credibility of witness), with Board of Appeals of Maynard v. Housing Appeals Comm. in the Dep't of Community Affairs, 370 Mass. 64, 66 (1976) (upholding commission's decision *176 where one commissioner attended all the hearings, another attended some and read transcript, and the third relied exclusively on the transcript).
The judge's order vacating the MCAD decision and remanding the matter to the MCAD for a new hearing is affirmed.
So ordered.
NOTES
[1] Charles Tyrone Brown, intervener.