WAYNE E. COVELL *vs.* DEPARTMENT OF SOCIAL SERVICES.

Barnstable. December 5, 2002. - July 17, 2003.

Present: MARSHALL, C.J., GREANEY, SPINA, SOSMAN, & CORDY, JJ.

*Abuse Prevention. Department of Social Services,* Registry of alleged perpetrators. *Administrative Law,* Substantial evidence, Record, Judicial review. *Witness,* Credibility. *Evidence,* Hearsay. *Due Process of Law,* Administrative hearing.

Discussion of the statutory and regulatory framework involved in the Department of Social Services' investigation and recording of reports of suspected child abuse. [772-779]

An alleged child abuser did not demonstrate any failure by the Department of Social Services to follow department regulations, policies, or procedures with respect to its decision to support a child's report of abuse, where the child's report itself provided reasonable cause to believe that abuse occurred. [779]

Substantial evidence supported the decision of an administrative hearing officer of the Department of Social Services to list an alleged child abuser's name in the department's registry of alleged perpetrators, where the department properly supported the underlying report of abuse, the child's claim of sexual assault was referred to a district attorney, and the child's report provided clear identification of the perpetrator of that supported allegation of abuse [779-782]; where the merits of the alleged child abuser's claim that there was not substantial evidence of the underlying abuse could not be entertained in the absence of the transcript of the hearing before the hearing officer [782-783]; and where, regardless of the limited record, review of the hearing officer's decision and excerpts of the record submitted confirmed that there was sufficient evidence of the underlying alleged abuse to satisfy the substantial evidence test [783-787].

The Department of Social Services provided due process to an alleged child abuser by giving notice of the department's investigation of allegations against him, an opportunity to be heard during the course of that investigation, and notice and an opportunity to be heard through the department's appeal procedures when the investigation concluded in a manner adverse to his interests. [787-788]

CIVIL ACTION commenced in the Superior Court Department on June 17, 1994.

The case was heard by *Richard F. Connon,* J., on a motion for judgment on the pleadings.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Ginny Sinkel,* Assistant Attorney General, for the defendant.

*James R. McMahon, Jr.,* for the plaintiff.

SOSMAN, J. After a hearing officer affirmed the decision of the Department of Social Services (department) to "support" an allegation of child abuse (see G. L. c. 119, § 51B; 110 Code Mass. Regs. § 4.32 [2000]) and to list the plaintiff's name on the department's registry of alleged perpetrators (see G. L. c. 119, § 51F; 110 Code Mass. Regs. § 4.36 [1996]), the plaintiff, Wayne E. Covell, sought judicial review of that decision. A judge in the Superior Court affirmed the department's decision; the Appeals Court reversed, ordering that Covell's name be removed from the registry,[1] *Covell* v. *Department of Social Servs.,* 54 Mass. App. Ct. 805, 816 (2002); and we granted the department's application for further appellate review. For the following reasons, we affirm the department's decision.

1. *Background.* On October 14, 1993, a school guidance counsellor filed a report under G. L. c. 119, § 51A, notifying the department of an allegation that Covell had sexually abused his teenaged stepdaughter, Linda.[2] Following its investigation, the department decided that the allegation of abuse was supported and that Covell's name should be listed in the department's registry of alleged perpetrators. The matter was also referred to the office of the district attorney pursuant to G. L. c. 119, § 51B (4), and the district attorney brought a complaint against Covell alleging three counts of indecent assault and battery on a child.

Covell sought a hearing with respect to the department's decision to place his name in the registry, and an initial hearing was held in March, 1994. That hearing officer affirmed the department's decision; a judge in the Superior Court also af-

[1] The Appeals Court found no error in the decision of the Department of Social Services (department) to support the underlying report of child abuse, reversing only with respect to the decision to list Covell's name in the registry of alleged perpetrators. *Covell* v. *Department of Social Servs.,* 54 Mass. App. Ct. 805, 811, 815-816 (2002).

[2] We use the same pseudonym for the child as that used by the Appeals Court.

firmed the department's decision; and Covell appealed. While that appeal was pending, Covell's criminal trial proceeded in the District Court, and the jury acquitted him of all charges. The Appeals Court was notified of that fact, and invoking the doctrine that an agency had the inherent power to reopen proceedings "in compelling situations as justice may require," the Appeals Court decided to defer action on Covell's appeal pending his application to reopen the administrative proceedings and submit additional evidence gleaned from the trial at which he was acquitted. *Covell* v. *Department of Social Servs.*, 42 Mass. App. Ct. 427, 433-434 (1997).

The matter was reopened, and a new evidentiary hearing before a different hearing officer was conducted. The only live witnesses who testified before the hearing officer were the department's investigator and Covell. The department also introduced the investigator's written report. Covell introduced some exhibits and most of the transcript from the criminal trial,[3] at which Linda, her mother, and Covell had all testified. The hearing officer found the following facts.

Covell married Linda's mother in 1983, when Linda was three years old. Linda lived with her mother and stepfather and their four children, and visited her biological father out of State each summer. In 1991, Covell acquired a small country store, operating that store in addition to his job at a supermarket. Linda began working at Covell's store, running the cash register and performing miscellaneous tasks. She worked with Covell at the store for a period in June, 1992, and then left for the summer to visit with her father. The store closed the following spring, at which time Covell acquired another general store in a different town. Linda worked in the new store that spring, again leaving to spend the summer with her father. By the time she returned, Linda was exhibiting what the hearing officer characterized as "challenging behavior not atypical for teenagers." Linda was "grounded," and lost certain privileges around the home, after her mother and Covell learned that she had lied to them about attending a "slam dance." Covell also

---

[3]The only portion not introduced (Linda's direct testimony) was not available for transcription. The transcript did include the cross-examination of Linda.

disapproved of Linda's friends, her tastes in music, and her television viewing habits, leading to occasional arguments and confrontations.

In early October, 1993, Linda told a friend that Covell had sexually abused her in the past. On October 12, Linda reported her allegations to a school guidance counsellor, telling the counsellor that the abuse had occurred approximately one and one-half years earlier. At the guidance counsellor's recommendation, Linda then told her mother. Linda was "extremely upset and crying" while disclosing her allegations to her mother. After that encounter, Linda and her mother met together with the guidance counsellor, whereupon the counsellor filed the required report with the department pursuant to G. L. c. 119, § 51A.

Within the following two weeks, the investigator assigned to the case spoke with the guidance counsellor, Linda, Linda's mother, and Covell. In her interview, Linda reported that Covell had abused her on three or four separate occasions, each occurring on a Saturday evening when she had been working at the store with Covell. Linda could not recall the exact dates of these incidents, but did remember that her mother had been pregnant at the time.[4] Linda claimed that, after the store closed in the evening, she would sit on a couch in the back room at the store watching television while waiting for her stepfather to complete that day's paperwork. Linda claimed that, on three or four occasions, Covell came back and sat next to her, placed his hands under her shirt, and fondled her breasts. She said that he would then reach down her pants inside her underwear. These incidents lasted about ten or fifteen minutes each time, with nothing being said by either of them during the incident. Linda was frightened and uncertain how Covell would react if she attempted to stop him. She tried to avoid him afterward, and began protesting that she did not want to work at the store any more.[5]

The mother confronted Covell with Linda's accusations when he came home from work one evening about one week after

---

[4]Linda's mother had given birth to her youngest child in November, 1992.

[5]At the criminal trial, the mother testified that Linda complained about working at the store in the fall of 1992.

Linda had made her disclosures to the guidance counsellor. The mother put Covell's belongings on the front steps and told him to leave. He began to cry, collapsed on the porch, and eventually left. The following day, the mother obtained a protective order against Covell. The mother subsequently filed for divorce.

During his interview with the investigator, Covell denied that he had touched Linda in any sexual or inappropriate manner. He confirmed that Linda had worked at the store in June, 1992; that she would watch television while sitting on a couch in the back room after the store closed; and that he would sometimes sit on the couch with her and ask her about the program she was watching. He said that he would hug her and pat her on the back as a way of showing how pleased he was with her helping out at the store. He denied putting his hands inside her clothes or fondling her, saying that "if anything seemed that way it was nothing more than incidental contact" and explaining that "[Linda] always wore a bra anyway." He also told the investigator that he and Linda would give each other "back rubs," including rubbing her neck "on top of her clothing." He told the investigator about recent incidents involving discipline of Linda, the increased restrictions that had been placed on her, and that, with both him and her mother standing firm on that discipline, "the strangle hold on her was too much." He also explained that he had marital problems and was seeing a counsellor for those problems. He opined that "everything will be destroyed if he can't go home," that he loved his wife, and that the children were "innocent pawns" in the struggle between himself and his wife. The investigator noted that Covell was "very nervous, very upset" during the interview.

The investigator decided to "support" Linda's allegations of sexual abuse, based on the fact that Linda had made her disclosures of abuse "consistently and in significant detail" to several people, including the investigator, and the fact that Covell had confirmed the accuracy of the events leading up to the alleged abuse. At the hearing, Covell brought out the fact that the investigator had asked Linda some "leading questions," but the investigator did not feel that posing those questions had impaired the interview. She noted that she had asked Linda some questions to which Linda had responded by denying that

particular forms of abuse had occurred — for example, despite specific inquiries, Linda denied that there had been any attempt to remove her clothes, denied that Covell had ever removed any of his clothes, and denied that Covell had made any attempt to have her touch or fondle him.

Covell also raised an issue with respect to the time period of this alleged abuse. During the criminal proceedings, the time frame for the alleged incidents had been narrowed down to October, 1992. Both Linda and her mother had testified that Linda was working in the store at that time, after the mother had stopped working in the late stages of her pregnancy. Covell claimed that Linda had not worked at all during the fall of 1992, and that she only resumed work in the spring of 1993 at the new store location. He sought to bolster that claim, and thus impair Linda's credibility as to the timing, by reference to the store's obtaining a liquor license and selling liquor during the summer and fall of 1992, whereas Linda had testified at trial that no liquor was sold at the store when she worked there. However, whatever the precise dates of the alleged abuse (as to which Linda had initially been uncertain), Covell acknowledged that Linda had worked in the store alone with him during June, 1992, and as to the later identified October, 1992, period, the mother corroborated Linda's recollection that she had worked at that time as well. The hearing officer therefore concluded that Linda's credibility had not been impaired by Covell's argument concerning the dates on which Linda had worked at the store.

The hearing officer also rejected Covell's theory that Linda's allegations had been made in response to recent discipline. The hearing officer noted that Linda's mother had been "equally if not more involved in handing out punishments" for Linda's misbehavior.[6] Linda's mother, despite her involvement in that discipline, had not been the target of any accusations, and the mother had in fact credited Linda's allegations of sexual abuse

[6]According to the mother's trial testimony, she was the one who had "grounded" Linda for three months in September, 1993; she was the one who had restricted Linda's television viewing; she was the one who had taken away Linda's telephone privileges; and she was the one who usually disciplined Linda. The only disciplinary incident involving Covell occurred when he confiscated some of Linda's music tapes containing what he viewed as offensive subject matter and lyrics.

at the hands of her stepfather and obtained a protective order against him in the wake of Linda's disclosures. In her trial testimony, the mother claimed that Covell had met with her in late 1993, after Linda's allegations had surfaced, at which time he explained to her that he was learning things about himself in counselling and acknowledged being sexually attracted to Linda. Covell denied making any such statement to his wife.

Covell claims that the hearing officer's decision was not supported by substantial evidence and that he is therefore entitled to reversal of the department's decision. In the alternative, he claims that if the hearsay allegations presented do constitute substantial evidence, such a conclusion would violate his due process rights.

2. *Statutory and regulatory framework.* Analysis of Covell's arguments first requires an examination of the specific regulatory requirements and procedural steps involved in the department's investigation and recording of reports of suspected child abuse. Pursuant to G. L. c. 119, § 51A, persons in specified professions and positions are required to notify the department whenever they have "reasonable cause to believe that a child under the age of eighteen years is suffering physical or emotional injury resulting from abuse inflicted upon him which causes harm or substantial risk of harm to the child's health or welfare including sexual abuse, or from neglect, including malnutrition." See *Matter of a Grand Jury Investigation,* 437 Mass. 340, 352-353 (2002), and cases cited. The department must conduct an investigation of such reports promptly, including an evaluation of the child's household and the risks to any other children in the household, and a determination of "the identity of the person or persons responsible" for any injuries to the child. G. L. c. 119, § 51B (1), (2). Depending on what that investigation reveals, the department then institutes various measures. If the investigation gives the department "reasonable cause" to believe that the child is suffering from abuse, the department offers the child's family "appropriate social services to prevent further injury to the child, to safeguard his welfare, and to preserve and stabilize family life whenever possible" and, if necessary, takes temporary custody of the child. G. L. c. 119, § 51B (3), (5). If the department's investigation

uncovers "reasonable cause" to believe that the abuse or neglect has resulted in particular listed forms of serious injury, or if the abuse consisted of sexual assault, the department must notify the office of the appropriate district attorney. G. L. c. 119, § 51B (4).

The department is required to maintain records of § 51A reports and § 51B investigations. Specifically, the department is to keep a "central registry" containing information identifying each child who is the subject of any report or investigation. G. L. c. 119, § 51F. If the department's investigation of a report determines that the report of suspected abuse "cannot be substantiated," the information in the central registry pertaining to that child, and to the child's parents or guardian, is to be removed after one year. *Id.* If the allegations in the report are "substantiated," the information remains in the central registry until the child reaches age eighteen years or until one year after the child's family ceases to receive services, whichever is later. *Id.* If the department determines that the allegations in a § 51A report are "frivolous," or if it makes some other "absolute determination that abuse or neglect has not taken place," the report is labeled "invalid" and the information pertaining to it is not entered in the central registry. *Id.* The data in the central registry are confidential and accessible only with the approval of the Commissioner of Social Services or by court order, and the commissioner is to promulgate rules and regulations governing access to information in the central registry. *Id.* It is a criminal offense, punishable by imprisonment for up to two and one-half years, for a department employee to make an unauthorized release of information from the central registry. *Id.*[7]

Extensive regulations govern the department's screening and investigation of reports of abuse or neglect and the maintenance of the required central registry and report files. When the department is notified of suspected abuse under § 51A, it first screens

---

[7]The department must also maintain the written reports generated as part of the investigation of and provision of services to abused or neglected children, with comparable restrictions on disclosure enforced by identical criminal penalties. G. L. c. 119, § 51E. Information identifying the child or the child's parents or guardian is to be removed from those reports under the same conditions and schedule as the removal of information from the central registry. *Id.*

the report to determine whether it involves alleged abuse or neglect by a "caretaker." 110 Code Mass. Regs. § 4.21 (2000). The department's principal focus is "to protect children from abuse or neglect *inflicted by their parents or parent substitutes*" (emphasis in original), *id.*, citing G. L. c. 119, § 1, and the regulations therefore define both "abuse" and "neglect" in a manner that limits those terms to acts committed by a "caretaker."[8] 110 Code Mass. Regs. § 2.00 (1996). The definition of "caretaker" is broad, including the child's parent, stepparent, guardian, and "any other person entrusted with the responsibility for a child's health or welfare whether in the child's home, a relative's home, a school setting, a day care setting (including babysitting), a foster home, a group care facility, or any other comparable setting. As such 'caretaker' includes (but is not limited to) school teachers, babysitters, school bus drivers, camp counselors, etc. The 'caretaker' definition is meant to be construed broadly and inclusively to encompass any person who is, at the time in question, entrusted with a degree of responsibility for the child. This specifically includes a caretaker who is him/herself a child (i.e. a babysitter under age 18)." 110 Code Mass. Regs. § 2.00. The initial screening of a report ascertains whether the report alleges abuse or neglect by such a "caretaker," and if it does, an investigation is then undertaken.

After conducting its investigation, the department determines whether to "support" or "unsupport" the allegation of abuse or neglect. 110 Code Mass. Regs. § 4.32(1) (2000). The department will "support" the allegation if it has "reasonable cause to believe that an incident (reported or discovered during the investigation) of abuse or neglect by a caretaker *did occur*"

---

[8] "Abuse" is defined as "the non-accidental commission of any act *by a caretaker* upon a child under age 18 which causes, or creates a substantial risk of physical or emotional injury, or constitutes a sexual offense under the laws of the Commonwealth or any sexual contact between a caretaker and a child under the care of that individual" (emphasis in original). 110 Code Mass. Regs. § 2.00 (1996). "Neglect" is defined as "failure *by a caretaker*, either deliberately or through negligence or inability, to take those actions necessary to provide a child with minimally adequate food, clothing, shelter, medical care, supervision, emotional stability and growth, or other essential care" (emphasis in original). *Id.*

(emphasis in original). 110 Code Mass. Regs. § 4.32(2) (2000).[9] The term "reasonable cause to believe" is defined as "a collection of facts, knowledge or observations which tend to support or are consistent with the allegations, and when viewed in light of the surrounding circumstances and credibility of persons providing information, would lead one to conclude that a child has been abused or neglected." *Id.* The regulation specifies that factors to be considered in assessing whether there is "reasonable cause" are "direct disclosure by the child(ren) or caretaker; physical evidence of injury or harm; observable behavioral indicators; corroboration by collaterals (e.g., professionals, credible family members); and the social worker and supervisor's clinical base of knowledge." *Id.* If the investigation finds "a lack of reasonable cause to believe a report that a child has suffered abuse or neglect inflicted *by a caretaker*," the department will "unsupport" the report (emphasis in original). 110 Code Mass. Regs. §§ 2.00, 4.32.

A decision to "support" an allegation "does *not* mean that the [d]epartment has made any finding with regard to the perpetrator(s) of the reported incident of abuse or neglect. It simply means that there is reasonable cause to believe that *some caretaker* did inflict *abuse* or neglect upon the child in question" (emphasis in original). 110 Code Mass. Regs. § 4.32. There are times, however, when the investigation does identify a specific alleged perpetrator of a supported incident of abuse or neglect. The identity of the "alleged perpetrator" is to be recorded when "[t]he incident of child abuse or neglect has been supported and referred to the District Attorney pursuant to [G. L. c. 119, § 51B (4),] and there is substantial evidence indicating that the alleged perpetrator was responsible for the abuse or neglect." 110 Code Mass. Regs. § 4.33(1) (1996). Commentary to that regulation gives examples of when an alleged perpetrator's identity should be recorded, including an example that is virtually identical to the facts of this case — i.e., when a teenaged girl makes an allegation of sexual abuse

[9]See 110 Code Mass. Regs. § 2.00, which defines "support" as "to find after an investigation that there is reasonable cause to believe a report that a child has suffered abuse or neglect inflicted *by a caretaker*," and clarifies that the term "support" replaces the term "substantiate" (emphasis in original).

by a parent, the department's investigation results in a decision to support that allegation, and the department refers it to the district attorney. Commentary to 110 Code Mass. Regs. § 4.33 (Example B).[10]

The regulations then create, as a "component" of the department's central registry maintained pursuant to G. L. c. 119, § 51F, a "registry of alleged perpetrators," containing the alleged perpetrator's name, identifying information, cross reference to the victim, and relationship to the victim. 110 Code Mass. Regs. § 4.36 (1996). The central registry, and hence its component registry of alleged perpetrators, is maintained as a computerized database; it does not include the underlying files and reports. 110 Code Mass. Regs. § 2.00. Consistent with the companion regulation as to when the department shall "record" an alleged perpetrator's identity, 110 Code Mass. Regs. § 4.33, the identified person is to be listed in the registry of alleged perpetrators when the same conditions are met — i.e., when the allegation of abuse or neglect has been supported, the matter has been referred to the district attorney, and there is "substantial evidence indicating that the alleged perpetrator was responsible for the abuse or neglect." 110 Code Mass. Regs. § 4.37 (1996). The regulations adopt the statutory definition of "substantial evidence" as "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*, citing G. L. c. 30A, § 1 (6). Once entered, the name remains in the registry of al-

---

[10]The commentary gives other examples of when the identification of an alleged perpetrator is to be recorded. One example involves a pediatrician opining that injuries to an infant were not accidental, where only two known caretakers — the infant's divorced parents — had access to the infant. Despite the fact that the decision to support the allegation of abuse has not determined which parent was responsible, the example indicates that *both* parents may be listed as "alleged perpetrators." Commentary to 110 Code Mass. Regs. § 4.33 (Example D). The other example given is where a child victim suffering medically confirmed nonaccidental injuries reports that he was injured when he was punched by his father, but then at other times reports that the injuries were inflicted by his grandfather. Again, if the underlying report of abuse is supported and referred to the district attorney, the commentary indicates that *both* the father and the grandfather are to be listed as alleged perpetrators. *Id.* (Example F). These examples do not comport with our normal understanding of "substantial evidence" as to a perpetrator's identification, and we need not resolve any of the issues that would be raised by listing a caretaker as an "alleged perpetrator" when the evidence shows nothing more than a possibility that that caretaker may have been the person responsible for the abuse.

leged perpetrators for seventy-five years. 110 Code Mass. Regs. § 4.37.

Department officials and employees are allowed access to the registry of alleged perpetrators for the following purposes: to screen applicants for employment with the department if the position involves direct contact with clients or children, to screen applicants for foster parents or adoptive parents,[11] to conduct an investigation into a report of abuse or neglect,[12] and to provide services to a child or family.[13] 110 Code Mass. Regs. § 4.38(1), (2) (1996). A person identified as an alleged perpetrator is given notice of that identification, 110 Code Mass. Regs. § 4.33(3) (2000), and a person may obtain confirmation whether his or her own name appears in the registry of alleged perpetrators. 110 Code Mass. Regs. § 4.38(3) (1996). Otherwise, no one may access information in the registry of alleged perpetrators without the written permission of the commissioner or a court order. 110 Code Mass. Regs. § 4.38(4). As part of the central registry, the registry of alleged perpetrators is governed by the same confidentiality requirements that govern the central registry. See G. L. c. 119, § 51F.

When a report of abuse or neglect has been supported by the initial investigation, the department proceeds with an "assessment" of the child's or the family's need for services. 110 Code Mass. Regs. §§ 5.01-5.04 (1996). Following the assessment, which is more comprehensive than the initial investigation, there is automatic review of the earlier decision to support the report. 110 Code Mass. Regs. § 5.05(1) (1996). At that juncture, a report that was originally supported may be redesignated as unsupported. 110 Code Mass. Regs. § 5.05(2) (1996). Whenever

[11]A person is not eligible to be a foster parent if that person has been identified as an alleged perpetrator, and the evaluation of a foster parent application therefore includes a check of the central registry. 110 Code Mass. Regs. §§ 7.100(3)(c), 7.107(2)(e) (1998).

[12]The initial screening of a report of abuse or neglect includes a check of the central registry, 110 Code Mass. Regs. § 4.22 (1998), presumably to ascertain whether the child or anyone involved in the new report has already been investigated in an earlier report.

[13]The assessment of what services should be provided to a child includes a check of the registry of alleged perpetrators to see whether any of the child's household members are listed in the registry. 110 Code Mass. Regs. § 5.04(7) (1997).

a previously supported report is changed to an unsupported report, the corresponding entries in the central registry are changed, and if any alleged perpetrator was identified in the previously supported report and listed in the registry of alleged perpetrators, that entry in the registry is eliminated. 110 Code Mass. Regs. § 5.05(3) (1996).

The department allows an administrative appeal from the decision to support a report of abuse or neglect and the decision to list someone on the registry of alleged perpetrators. 110 Code Mass. Regs. § 10.06(8), (9) (1994). The decision to support a report may be challenged by, among others, any caretaker identified in the department's records as "the person believed to be responsible for the abuse or neglect." § 10.06(8). The decision to support a report will be reversed if, based on either the original information or new information, the decision to support the report is not in conformity with department policies, regulations, or procedures and resulted in substantial prejudice to the aggrieved party. § 10.06(8)(c). The decision to list a person on the registry of alleged perpetrators may be appealed by the person so listed, and that decision will be reversed if, based on either the original information or new information, the decision "was not in accordance with 110 [Code Mass. Regs.] [§] 4.33," or not in conformity with the department's regulations or procedures and resulted in substantial prejudice. § 10.06(9)(a). Because the decision to list someone as an alleged perpetrator is itself dependent on the decision to support the report, an appeal of the decision to list the alleged perpetrator automatically entails review of the decision to support. § 10.06(9)(b). 110 Code Mass. Regs. § 10.08(2), (3) (1998).

Hearings on appeals are not subject to any formal rules of evidence, and written materials from the department's files and records are admissible. 110 Code Mass. Regs. § 10.21(1), (4) (1993). A party may request the issuance of subpoenas for witnesses, but "[i]t is the policy of the [d]epartment that child victims shall not be required to testify at a [hearing], unless a compelling reason can be shown as to why the child's testimony is essential." 110 Code Mass. Regs. § 10.13(2)(a), (b) (1993). The burden is on the appellant to show "by a preponderance of the evidence" that the challenged decision was not in conformity

with the department's policies, regulations, or procedures, and that the appellant suffered substantial prejudice as a result. 110 Code Mass. Regs. § 10.23 (1993). Hearings are recorded, and a transcript may be obtained by an aggrieved party at that party's expense. 110 Code Mass. Regs. §§ 10.26, 10.27 (1998). The decision of the hearing officer is subject to judicial review under G. L. c. 30A. 110 Code Mass. Regs. § 10.30 (1998).

3. *Discussion.* a. *Decision to support the report of abuse.* Covell has not demonstrated any failure to follow department regulations, policies, or procedures with respect to the decision to support the report of abuse. See § 10.06(8)(c). To support the report, there need only be "reasonable cause to believe" that abuse occurred, which, as the regulations expressly state, may be based on the child's own report of abuse. 110 Code Mass. Regs. § 4.32(2). The fact of Covell's acquittal at his criminal trial does not undermine that "reasonable cause," given the differing standards of proof applied.

b. *Decision to list Covell on the registry of alleged perpetrators.* Covell contends that the decision to list his name in the registry of alleged perpetrators was not supported by "substantial evidence," 110 Code Mass. Regs. § 4.37, and thus was not in conformity with the department's regulations. In particular, he contends that his testimony denying the allegation made the case hinge on a comparison of his credibility with Linda's credibility, and that the hearing officer could not find Linda to be the more credible of the two when Linda did not appear in person.

i. *Interpretation of the listing regulations.* Covell's argument inherently contends that the department must present "substantial evidence" that the underlying abuse occurred in order to list him in the registry of alleged perpetrators. A careful reading of the regulations governing identification of alleged perpetrators and listing in the registry does not suggest such a requirement. A person is to be recorded as an alleged perpetrator listed in the registry if (1) "the allegation of child abuse or neglect has been supported" (a determination that only requires "reasonable cause to believe" that the abuse occurred), (2) the nature of the abuse or injury is such that it is referred to the district attorney (which the department was required to do in this case pursuant to G. L. c. 119, § 51B [4]), and (3) "there is substantial

evidence indicating that the alleged perpetrator was responsible for the abuse or neglect." 110 Code Mass. Regs. §§ 4.33, 4.37. If, as Covell's argument assumes, the underlying abuse itself needed to be proved by "substantial evidence," it would be superfluous to include as a prerequisite to identification and listing that the report be "supported," as that requirement only requires "reasonable cause to believe" that the abuse occurred. As constructed by the regulations, the registry of alleged perpetrators is not limited to those cases of abuse that have been proved by some greater quantum of evidence than a mere "supported" report.[14] Rather, the registry includes all cases where the underlying abuse has been established by "reasonable cause to believe" and the identification of the perpetrator is sufficiently clear that it meets the "substantial evidence" test as to the identification itself. Thus, for example, if a child reports that his father deliberately pushed him down the stairs while the father contends that the child fell down the stairs by accident, a decision to "support" the report determines that the department will treat the case as one of abuse as opposed to an accident. Having made the decision to support the allegation, and assuming that the severity of the child's injuries led to referral to the district attorney, the father will be listed on the registry of alleged perpetrators because the evidence is clear that he was the caretaker responsible for the abuse that has been supported.

[14]Put differently, the regulations do not envision some gap in the records whereby an alleged perpetrator of a supported incident of abuse could not later be identified as such. For example, the department does not wish to place a foster child (who has already been subjected to abuse or neglect by a parent) in the care of a foster parent where there is "reasonable cause to believe" that another child suffered abuse or neglect while in that person's care and "substantial evidence" to support the identification of that person as the perpetrator. See 110 Code Mass. Regs. § 7.100(3)(c) (1998). Similarly, when the department is investigating a report of abuse or neglect, or assessing what services should be provided to an abused or neglected child, it is important for the department to ascertain whether any of the people involved in the newly reported incident, or any household members living with the child being serviced, have previously been identified as perpetrators of any supported incident of abuse or neglect. See 110 Code Mass. Regs. §§ 4.22, 5.04(7) (1996). The gap in the records that would be created by Covell's interpretation of the regulations — a supported incident of abuse, serious enough to refer to the district attorney, with no corresponding listing in the registry of alleged perpetrators despite unambiguous identification of that perpetrator — would frustrate the intended purpose of that registry.

There would be no listing of any alleged perpetrator if it remained unknown *which* caretaker was involved — mother, father, stepparent, grandparent, babysitter, or older sibling left in charge. Thus, while a caretaker may vehemently contend that an injury to a child is the result of an accident and not the product of abuse, or, as here, that there was no sexual contact with the child, once the department has properly decided to support the report of abuse based on the "reasonable cause" standard, the listing of the alleged perpetrator is merely a matter of identification. It does not reopen, or impose a higher standard of proof on, the underlying determination that the abuse occurred.

Here, the investigator apparently understood the requirements for listing an alleged perpetrator in precisely this fashion. Her report concludes: "Since sexual abuse by a caretaker was supported a mandatory [district attorney] referral is warranted. Furthermore since the alleged perpetrator was clearly identified by the child, [Linda], the alleged perpetrator will be placed on the Central Registry." If that is the correct interpretation of the regulations, there is no error in the listing of Covell. The department properly supported the underlying report of abuse, the claim of sexual assault was referred to the district attorney, and the child's report provided clear identification of the perpetrator of that supported allegation of abuse.

However, for reasons that are not specified, the hearing officer analyzed Covell's arguments as if the underlying abuse, and not just the identification, needed to be supported by substantial evidence, and she found that there was substantial evidence to support a conclusion that the abuse had occurred. Before the Appeals Court and before this court, the department's brief has similarly argued that the finding of abuse itself is supported by substantial evidence.[15] Thus, assuming (without deciding) that the regulations require that the underlying abuse itself be demonstrated by substantial evidence before the department's records and registry may list anyone as an "alleged perpetra-

---

[15] The department has apparently taken a similar position in other cases challenging listing in the registry of alleged perpetrators. See *Edward E.* v. *Department of Social Servs.*, 42 Mass. App. Ct. 478, 479-481, 484-487 (1997) (holding that hearsay allegation by three year old child claiming sexual abuse by her father, made under suspicious circumstances and with implausible detail, did not amount to "substantial evidence" sufficient to support listing in registry).

tor" of a supported incident of abuse, we will assess whether there was substantial evidence in this case.

ii. *Inadequacy of appellate record.* Our consideration whether there was substantial evidence of the underlying abuse is hampered by the fact that Covell did not obtain or submit the transcript of the hearing before the hearing officer. He has submitted the available transcripts from the criminal trial, plus the exhibits submitted to the hearing officer, but not the testimony of the department's investigator (the sole witness presented by the department at the agency hearing) or his own testimony at that hearing. We can, as the Appeals Court did, assess the logic of the analysis that the hearing officer articulated in her decision, see *Covell* v. *Department of Social Servs.*, 54 Mass. App. Ct. 805, 814-816 (2002), but not the evidence itself, which may have included detail and nuance that was not expressly referenced in the hearing officer's written decision. See *New Bedford Gas & Edison Light Co.* v. *Assessors of Dartmouth*, 368 Mass. 745, 751 (1975) ("summary of evidence contained in the board's 'Findings of Fact and Report' is no substitute for a transcript"). As the Appeals Court noted, the department's argument that Covell's failure to submit the complete record precludes him from challenging the sufficiency of the evidence is "technically correct." *Covell* v. *Department of Social Servs.*, *supra* at 812. See *Fox Ridge Assocs. & Co.* v. *Assessors of Marshfield*, 387 Mass. 1002 (1982); *New Bedford Gas & Edison Light Co.* v. *Assessors of Dartmouth*, *supra* at 749-751; *Sturdy Memorial Found., Inc.* v. *Assessors of N. Attleborough*, 47 Mass. App. Ct. 519, 519 (1999).

Unlike the Appeals Court, however, we do not brush the department's argument aside. That a transcript must be submitted to support a claim that the evidence was insufficient is not some hypertechnical requirement, but a reflection of the fact that resolution of such a claim requires the reviewing court to see the entirety of the evidence that was presented. In the absence of such a transcript, both sides have had to rely exclusively on the contents and analysis reflected in the hearing officer's decision. Contrary to the Appeals Court's suggestion, *Covell* v. *Department of Social Servs.*, *supra* at 812-813, the fact that the department argues the merits based on that decision

does not amount to any agreement or concession by the department that the appellate record is adequate. There was no stipulation or agreement to limit the record on appeal to the exhibits introduced at the hearing; no agreement or stipulation that the hearing officer's decision contained each and every relevant detail of the testimony of the two witnesses; and no agreed statement of facts submitted as an acceptably condensed version of the record below. Rather, the first argument advanced in the department's brief by the Appeals Court, supported by ample precedent, was that the merits of Covell's substantial evidence argument should not be entertained in the absence of the hearing transcript. On this ground alone, the department should prevail.

iii. *Application of the substantial evidence test to the limited record.* Even if we were to overlook this defect in the appellate record, our review of the hearing officer's decision and the excerpts of the record submitted confirms that there was sufficient evidence of the underlying alleged abuse to satisfy the substantial evidence test. "Substantial evidence" means "such evidence as a reasonable mind might accept as adequate to support a conclusion," G. L. c. 30A, § 1 (6), a test which takes into account the entire record, both the evidence supporting the agency's conclusion and whatever in the record fairly detracts from the weight of that evidence. See *New Boston Garden Corp.* v. *Assessors of Boston*, 383 Mass. 456, 466 (1981), and cases cited.[16]

The investigator, who met with Linda in person in the immediate aftermath of her disclosures, related that Linda's allegations of abuse were specific, detailed, and consistent. Linda

---

[16]We do not accept the further gloss the Appeals Court placed on the familiar substantial evidence test when it suggested that the "level[]" of the evidence necessary to satisfy that test varies depending on the "significance of the finding to be made" or "the importance of the decision involved." *Covell* v. *Department of Social Servs.*, *supra* at 813. To the various agencies pursuing their respective missions, and to aggrieved parties challenging those agency decisions through administrative and judicial proceedings, the agency's decision is both "important" and "significant," whatever its subject matter or potential consequences. The substantial evidence test does not become more stringent or more relaxed based on a judge's perception that a particular agency decision is of greater or lesser importance or portends consequences of greater or lesser severity.

was thirteen years old at the time, not a small child. Cf. *Edward E.* v. *Department of Social Servs.*, 42 Mass. App. Ct. 478, 484-487 (1997) (three year old child claiming sexual abuse). The backdrop for the alleged abuse, i.e., the customary routine of sitting together on the couch in the store's back room after closing time, was realistic, and indeed confirmed by Covell himself. Cf. *id.* (child placed abuse in implausible setting and circumstances).

As with virtually every case involving a child's allegation of sexual abuse, one of the primary issues in assessing the credibility of that allegation is whether there is any reason why the child would invent or fabricate such an allegation. If the evidence indicates a likelihood that there is such a reason, that would greatly tend to undermine the child's credibility. On the other hand, if there is no plausible reason for fabrication, the very absence of such a reason tends to support the child's credibility. Here, the evidence tested, and substantial evidence refuted, three of the reasons commonly advanced as possible explanations for a child's false accusation of sexual assault: (1) that the allegation was the product of suggestive questioning by an interviewer, (2) that some other adult with a motive to harm the alleged perpetrator planted the allegation in the child's mind, or (3) that the child had some motive to invent the false allegation on her own.

With respect to any suggestive questioning, the evidence was undisputed that Linda first reported the abuse to a friend and then, on her own initiative, to a guidance counsellor. There was no suggestive questioning that preceded the allegation. While the department investigator later posed some "leading questions" to Linda during her interview, Linda responded in the negative to those questions. Rather than expand the scope of her allegations in response to any suggestion implicit in such questions, Linda remained consistent as to the specific but limited acts that constituted the alleged abuse.

As to some other adult prompting Linda to make these accusations, the record is devoid of anything other than Covell's vague speculation that his wife was using the children as "pawns" during their divorce. Aside from the fact that that is speculation, the divorce was sought *after* Linda's allegations

surfaced — there was not a bitter divorce underway at the time the allegations were made. Cf. *Edward E.* v. *Department of Social Servs., supra* at 483 ("contentious litigation" between parents at time small child alleged sexual abuse by father). Nor was there any evidence that Linda's mother was involved with the disclosures. Linda made her disclosures to her friend and guidance counsellor at a time when her mother was not present. Rather than being in league with her mother or peculiarly susceptible to her influence, the evidence was that Linda was beginning to rebel against parental influence and resented the tight restrictions her mother had placed on her in an effort to curb that rebellion. Linda only told her mother about the abuse, with some difficulty, after the guidance counselor recommended that she do so. The mother's reaction was one of shock, and she had "difficulty comprehending what had happened." There is nothing to suggest that these allegations were planted in Linda's mind by her mother.

As to the theory that Linda had her own motive to fabricate the allegations (the theory most vigorously advanced by Covell), the evidence did not support that theory. The hearing officer noted that Linda's adolescent defiance disturbed both her mother and Covell. However, it was Linda's mother, not Covell, who was principally involved in the efforts at discipline, and the mother, not Covell, who had instituted the assortment of restrictions that had been placed on Linda in September, 1993, the month prior to her report of abuse. The mother, well aware of Linda's recent infractions and Linda's dismay at the imposition of discipline, credited her daughter's allegations against Covell. The hearing officer had a sound basis for concluding that these allegations against Covell were not prompted by a motive to retaliate for recent discipline.[17]

We reject Covell's suggestion that the evidence of abuse can

---

[17]The hearing officer also rejected the argument that discrepancy or uncertainty as to the dates of the alleged abuse undermined the reliability of Linda's allegations. The precise dates were irrelevant, and a child's inability to give precise dates of prior abuse does not impair the credibility of the allegation that abuse occurred. Moreover, it was undisputed that, in June, 1992, Linda had worked with Covell at the store on various occasions, and Covell testified that, after closing time, they had sat together on the couch and given each other "back rubs." Linda's initial disclosure in October, 1993, dated the

not be "substantial" because Linda's statements were presented only through hearsay sources — the testimony and report of the investigator and the (partial) transcript of Linda's testimony at the criminal trial. Substantial evidence may be based on hearsay alone if that hearsay has "indicia of reliability." *Embers of Salisbury, Inc.* v. *Alcoholic Beverages Control Comm'n*, 401 Mass. 526, 530 (1988). As discussed above, the detail and consistent nature of Linda's reports, her resistance to the suggestiveness of leading questions, and the absence of any motive or reason for her to make false allegations against Covell combine to give her statements some indicia of reliability. Her testimony at the criminal trial, presented to the hearing officer by way of a partial transcript, was given under oath. That her trial testimony had not, in the jury's opinion, met the standard of proof "beyond a reasonable doubt" — the highest standard of proof imposed by our jurisprudence — does not mean that it was unreliable for purposes of the substantial evidence test.[18]

Covell's argument also ignores the fact that the hearing officer heard Covell's own testimony. While disbelief of Covell's denials does not create positive evidence that abuse occurred, the hearing officer could consider his demeanor and credibility in light of Linda's statements to the interviewer and the transcript of her trial testimony, and could judge the credibility of his proffered explanation that Linda was retaliating against him for recent discipline imposed on her. (The investigator's

abuse as approximately one and one-half years earlier, which would adequately comport with that June, 1992, time frame. To the extent that Linda subsequently changed her assessment of the dates, placing the abuse in October, 1992, there was evidence that Linda had also worked at the store at that time, including her mother's testimony that Linda covered for her at the store when she, the mother, had to stop working that fall in the final weeks of her pregnancy.

[18]Covell's reliance on *Goodridge* v. *Director of the Div. of Employment Sec.*, 375 Mass. 434, 436-437 (1978), is misplaced. In that case, two eyewitnesses testified to divergent versions of what had occurred, and a third witness, who had not observed the events in person, gave a hearsay account of yet another version of those events. On that record, a decision that credited the witness who had not observed the events was not supported by substantial evidence because it was contrary to the testimony of the only two eyewitnesses. As such, the case recognizes the difference between eyewitnesses and persons who are only reporting what they have heard second hand. It does not suggest that the statement of an eyewitness, submitted in some fashion other than live testimony, cannot be substantial evidence.

report and, presumably, the investigator's testimony referenced the observation that Covell had been "very nervous, very upset" during his interview.) Covell is correct when he claims that the case revolved around an assessment of credibility, but we do not accept his assertion that credibility cannot be compared unless all of the witnesses testify in person.[19] Cf. Mass. R. Civ. P. 32 (a) (3), as amended, 392 Mass. 1105 (1984) (allowing introduction of deposition testimony at trial). While live testimony may provide the optimal opportunity for the assessment of credibility, the fact that parties before an agency have differing versions of critical events does not make live testimony the sine qua non for satisfying the substantial evidence test.[20]

On this record, such as it has been presented to us, the hearing officer had a sound basis for determining that there was substantial evidence to support Linda's allegations of abuse by her stepfather.

c. *Due process.* Covell's constitutional arguments are without merit. The department readily acknowledges that its decisions to support allegations of abuse and to list alleged perpetrators in its central registry implicate due process protections. However, Covell received due process. He was given notice of the department's investigation and an opportunity to be heard dur-

___

[19]In cases where live witnesses giving different versions *do* testify at an agency hearing, a decision relying on an assessment of their relative credibility cannot be made by someone who was not present at the hearing. See *Bayer Corp.* v. *Commissioner of Revenue*, 436 Mass. 302, 305-308 (2002) (term of only Appellate Tax Board member to hear evidence expired; decision by other members premised on resolution of conflicting testimony vacated); *Salem* v. *Massachusetts Comm'n Against Discrimination*, 404 Mass. 170, 173, 174-175 (1989) (commissioner who presided at evidentiary hearing died before rendering decision; decision by successor who had not been at hearing vacated); *Fox* v. *Commissioner of Revenue*, 51 Mass. App. Ct. 336, 340-343 (2001) (chairman of the Appellate Tax Board who had heard conflicting evidence no longer on board when decision rendered; decision vacated where board members issuing decision had not been present). These cases do not suggest that credibility disputes can only be resolved by live testimony. Rather, they stand for the proposition that when parties do present live testimony, they are entitled to have the credibility determination made by someone who heard the testimony that was presented.

[20]Such an approach to the substantial evidence test would also be contrary to the department's articulated policy of *not* having child witnesses testify at such proceedings absent a "compelling reason" showing that the child's testimony is "essential." 110 Code Mass. Regs. § 10.13(2)(a).

ing the course of that investigation, and when the investigation concluded in a manner adverse to his interests, he was given notice and an opportunity to be heard through the department's appeal procedures. Instead, what Covell is actually asserting is a right of confrontation, as the only claimed defect in the proceedings is that Linda did not testify in person.[21] There is no right of confrontation in civil proceedings. See *Frizado* v. *Frizado*, 420 Mass. 592, 596-597 n.3 (1995); *Commonwealth* v. *McGruder*, 348 Mass. 712, 716 (1965), cert. denied, 383 U.S. 972 (1966). That Linda did not testify at the administrative hearing does not violate Covell's due process rights.

4. *Conclusion.* The judgment of the Superior Court affirming the department's decision to support the report of child abuse and to list Covell's name on the department's registry of alleged perpetrators is affirmed.

*So ordered.*

---

[21]Covell had, of course, confronted Linda when she testified at his criminal trial, and he was allowed to submit as evidence at the agency hearing the transcript of his attorney's cross-examination of Linda at that trial.